## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| KPR U.S., L.L.C. and Cardinal Health 200, LLC | Case No. |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| vs. | |
| LifeSync Corporation, Advantage Medical Electronics, LLC, and 3M Company | |
| Defendants. | |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiffs KPR U.S., L.L.C. ("KPR") and Cardinal Health 200, LLC ("CH"), for their complaint against LifeSync Corp. ("LifeSync"), Advantage Medical Electronics, LLC ("AME") (LifeSync and AME collectively referred to as "the LifeSync Defendants") and 3M Company ("3M"), hereby allege as follows:

## NATURE OF THE ACTION

1.      This is an action for infringement of United States Patent 8,038,484 (the "'484 Patent") and United States Patent 8,795,004 (the "'004 Patent") (together, the "Asserted Patents").  This action arises under the patent laws of the United States, Title 35, United States Code.

## PARTIES

2.      KPR is a limited liability company organized and existing under the laws of Delaware and has its principal place of business at 777 West Street, Mansfield, MA 02048.

3.      CH is a limited liability company organized and existing under the laws of Delaware and has its principal place of business at 7000 Cardinal Place, Dublin, OH 43017.

1

4.      KPR is an affiliate of CH and an affiliate of Cardinal Health, Inc., a leader and innovator in health care services and medical products, among other affiliates.  In April 2017, Cardinal Health, Inc. purchased certain assets from Medtronic plc.  Those assets include the Asserted Patents.  As part of the asset transfer between Cardinal Health, Inc. and Medtronic plc, Covidien LP, then a Medtronic plc affiliate, transferred ownership of the Asserted Patents to KPR, a Cardinal Health, Inc. affiliate.  KPR now owns the Asserted Patents.  The assignment transferring ownership of the Asserted Patents from Covidien LP to KPR is recorded at Reel 044118 and Frame 0652.

5.      The Asserted Patents cover important innovations in connectors used in cardiac monitoring equipment.  Certain innovations disclosed and claimed in the Asserted Patents are embodied in certain of CH's products, including its highly successful and innovative line of Kendall DL® disposable ECG/EKG leads.

6.      On information and belief, LifeSync is a corporation organized and existing under the laws of Delaware and has its principal place of business at 11705 NW 39th Street, Coral Springs, FL 33065.

7.      On information and belief, AME is a limited liability company organized and existing under the laws of Delaware and has its principal place of business at 11705 NW 39th Street, Coral Springs, FL 33065.

8.      On information and belief, LifeSync and AME are related entities and have at various points each engaged in the business of selling medical products, including the infringing products at issue.

9.      On information and belief, 3M is a corporation organized and existing under the laws of Delaware and has its principal place of business at 3M Center, St. Paul, MN 55144.

## JURISDICTION AND VENUE

10.     This is an action for patent infringement under the patent laws of the United

States, Title 35, United States Code.

11.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331 and 1338(a).

12.     This Court has personal jurisdiction over LifeSync because, on information and

belief, LifeSync's contacts with Florida and this district are continuous and so pervasive as to

render it essentially at home in this district.  Additionally, on information and belief, LifeSync

engages and has engaged in systematic activities in this district leading to the present action,

including making, using, offering to sell, selling, and/or importing products that infringe the

Asserted Patents.

13.     This Court has personal jurisdiction over AME because, on information and

belief, AME's contacts with Florida and this district are continuous and so pervasive as to render

it essentially at home in this district.  Additionally, on information and belief, AME engages and

has engaged in systematic activities in this district leading to the present action, including

making, using, offering to sell, selling, and/or importing products that infringe the Asserted

Patents.

14.     This Court has personal jurisdiction over 3M because, on information and belief,

3M has engaged in systemic activities in this district leading to the present action, including

making, using, offering to sell, selling, and/or importing products that infringe the Asserted

Patents.  For example, 3M operates a website at

https://www.3m.com/3M/en_US/p/c/medical/patient-monitoring/cables-leadwires/ that is

accessible throughout Florida and this district and that advertises products that infringe the

3

Asserted Patents, invites purchasers to review details about those products, and interactively allows customers to contact 3M about the products.  On information and belief, 3M's customer-interactive website lists catalog numbers, 3M product numbers, and UPC numbers for the products that infringe the Asserted Patents to allow customers—including Florida customers—to easily reference and order the products.  Additionally, on information and belief, the 3M products infringing the Asserted Patents are sourced from AME and/or LifeSync, both of which reside in this district.  3M has thus availed itself of the benefits of Florida and this district, particularly with respect to the subject matter of this action, and personal jurisdiction over 3M is appropriate.

15.     Venue in this Court is proper under 28 U.S.C. §§ 1391(b) and 1400(b).

## JOINDER

16.     Joinder of the LifeSync Defendants and 3M in this action is appropriate under 35 U.S.C. § 299.

17.     KPR's and CH's rights to relief against the LifeSync Defendants and 3M arises out of the same transaction, occurrence, or series of transactions or occurrences relating to the making, using, importing into the United States, offering for sale, or selling of the same accused products.

18.     There are questions of fact common to the LifeSync Defendants and 3M that will arise in the action.

## COUNT 1:
## THE LIFESYNC DEFENDANTS' DIRECT INFRINGEMENT OF THE '484 PATENT

19.     The U.S. Patent and Trademark Office duly issued the '484 Patent, titled "ECG Electrode Connector," on October 18, 2011.  A true and correct copy of the '484 Patent obtained from the U.S. Patent and Trademark Office's databases is attached as Exhibit 1.

20.    On July 28, 2017, KPR was assigned all right, title, and interest in the '484 Patent and remains the legal owner of the '484 Patent.

21.    CH is the exclusive licensee of the '484 Patent.

22.    The '484 Patent is valid, is enforceable, and claims patentable subject matter.

23.    The LifeSync Defendants have infringed, and continue to infringe, certain claims of the '484 Patent under 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by making, using, selling, offering to sell, and/or importing ECG/EKG lead wires having closed-end electrode connectors, including the lead wires bearing product numbers LW-309DS50/5A, LW-309DS50/5AT, LW-309DS50/3A, LW-309DS50/4V, LW-309DS50/5V, LW-309DS50/6A, LW-309DS5/6AT, LW-341DS50/3A, LW-341DS50/5A, LW-341DS50/6A, LW-381DS50/3A, LW-381DS50/6A, LW-391DS50/3A and LW-391DS50/5A, as well as any materially similar products (collectively, the "'484 Accused Products").

24.    On information and belief, AME previously sold the '484 Accused Products and LifeSync now sells the '484 Accused Products.  However, any make, use, sale, offer to sell, or importation of the '484 Accused Products by the LifeSync Defendants infringes and has infringed the '484 Patent.

25.    The LifeSync Defendants have infringed and continue to infringe at least claims 3-11 of the '484 Patent.

26.    For example, claim 3 of the '484 Patent reads as follows:

**3.** An ECG connector assembly, comprising:

a housing having a first opening disposed therein dimensioned to operably receive the press stud of an ECG electrode pad;

an electrical contact member defining a contact plane and having a second opening disposed therein, the second opening disposed substantially concentrically to the first opening, wherein the perimeter of the second opening is less than the perimeter of the first opening; and

5

a lever pivotable about an axis orthogonal to the contact plane and disposed within the housing and having at least an engaged position and a disengaged position, wherein the lever further includes an actuating end, an engaging region, and a pivot, the engaging region configured to operably engage a narrow waist portion of the press stud and further configured to couple the narrow waist portion of the press stud with the electrical contact member when the lever is in the engaged position.

27.     The '484 Accused Products include ECG connector assemblies meeting each limitation of claims 3-11 of the '484 Patent.  As one example, the LifeSync Defendants' products bearing product numbers LW-309DS50/5A and LW-309DS50/5AT include each element listed in claim 3.

28.     The LW-309DS50/5A and LW-309DS50/5AT products include an ECG connector assembly:



29.     The LW-309DS50/5A and LW-309DS50/5AT products include a housing having a first opening disposed therein dimensioned to operably receive the press stud of an ECG electrode pad.  Each lead includes a white, plastic housing having an opening into the interior that is dimensioned to operably receive a press stud of a monitoring electrode pad:



30.     The LW-309DS50/5A and LW-309DS50/5AT products include an electrical contact member defining a contact plane and having a second opening disposed therein, the second opening disposed substantially concentrically to the first opening, wherein the perimeter of the second opening is less than the perimeter of the first opening.  Each lead includes a metal electrical contact member (ECM) defining a plane and having an opening that is substantially concentrically aligned with the housing opening and is smaller than the housing opening (thereby defining a smaller perimeter):



31.     The LW-309DS50/5A and LW-309DS50/5AT products include a lever pivotable about an axis orthogonal to the contact plane and disposed within the housing and having at least an engaged position and a disengaged position.  The lever is pivotably coupled to the housing and is pivotable orthogonal to the face plane of the ECM.  The lever is at least partially disposed

within the housing.  The lever has an engaged position (shown) and a disengaged position (e.g., by applying sufficient pressure to the lever):



32.      On the LW-309DS50/5A and LW-309DS50/5AT products, the lever further includes an actuating end, an engaging region, and a pivot, the engaging region configured to operably engage a narrow waist portion of the press stud and further configured to couple the narrow waist portion of the press stud with the electrical contact member when the lever is in the engaged position.  The lever includes an actuating end, an engaging region, and a pivot.  By applying sufficient pressure to the actuating end of the lever, the lever swings (about the pivot) from a closed position (shown) to an open position so that the engaging portion engages (through mechanical engagement) the press stud and couples it with the ECM (when pressure is removed and the lever is closed and in the engaged position):



33.     The LifeSync Defendants' acts of infringement have caused damage to KPR and CH.  KPR and CH are entitled to recover from the LifeSync Defendants damages sustained as a result of the LifeSync Defendants' infringement of the '484 Patent.

34.     In particular, CH has lost profits from lost sales of its own ECG/EKG lead wires that include electrode connectors which embody claims of the '484 Patent due to the LifeSync Defendants' infringement.  There are no substantially non-infringing substitutes for the patented electrode connectors.

35.     Further, CH has suffered damages in the form of price erosion.  In response to the LifeSync Defendants' infringing activities, CH was forced to lower the prices of its own lead wires that include electrode connectors embodying claims of the '484 Patent in order to compete with the LifeSync Defendants' infringing lead wires.

36.     At a very minimum, KPR and CH are entitled to a reasonable royalty on sales of the LifeSync Defendants' infringing lead wires, together with interest and costs.

37.     Moreover, the LifeSync Defendants' infringements are and have been egregious and willful, entitling KPR and CH to treble damages.

38.     As early as January 18, 2019, AME has been on notice that at least certain of the '484 Accused Products infringe one or more claims of the '484 Patent.  Counsel for KPR and CH sent a letter to AME, detailing how certain of the '484 Accused Products infringe the '484 Patent and demanding that AME cease and desist all infringing conduct.  The letter included a copy of the '484 Patent together with example charts showing how certain of the '484 Accused Products meet the limitations of certain claims of the '484 Patent, totaling over 200 pages.  The January 18, 2019 letter is attached as Exhibit 2.

39.     On January 25, 2019, counsel for AME replied via letter, expressly acknowledging that AME had received the January 18, 2019 letter.  The January 25, 2019 letter is attached as Exhibit 3.

40.     On February 19, 2019, counsel for AME sent a more complete response via letter to the initial January 18, 2019 letter.  In the February 19, 2019 letter, AME: (a) acknowledged that KPR and CH accused three AME products of infringing the '484 Patent, and (b) denied liability.  The February 19, 2019 letter is attached as Exhibit 4.

41.     On March 7, 2019, counsel for KPR and CH responded to AME's February 19, 2019 letter, reaffirming that AME's products infringed the '484 Patent, refuting AME's various excuses for why it should not be liable for infringement, and restating the demand that AME cease and desist all infringing activities.  The March 7, 2019 letter is attached as Exhibit 5.

42.     Additionally, representatives for KPR and CH met in person with representatives for the LifeSync Defendants on April 17, 2019.

43.     Further still, counsel for KPR and CH and counsel for AME held a telephone conference on October 8, 2020, during which counsel for KPR and CH once again requested that AME discontinue its infringing activities.

44.     In light of the vast amounts of correspondence and discussions between the parties and their representatives, AME knows and has known how and why certain of the '484 Accused Products infringed the '484 Patent, at least since January 18, 2019.  Disregarding KPR's and CH's patent rights, AME pressed on with its infringement.  The LifeSync Defendants' infringement continues unabated to this day.

45.     On information and belief, in view of the close overlap of individuals associated with both AME and LifeSync, as well as AME and LifeSync operating out of the very same

address, LifeSync had full knowledge that KPR and CH had accused certain AME products of infringement.  Accordingly, any infringements attributed to LifeSync are equally as egregious and willful as AME's infringements and subject LifeSync to treble damages in the same way as AME.

46.     The LifeSync Defendants' infringements warrant a finding that this is an exceptional case, entitling KPR and CH to recover their attorney fees and expenses.

## COUNT 2:
## THE LIFESYNC DEFENDANTS' DIRECT INFRINGEMENT OF THE '004 PATENT

47.     The U.S. Patent and Trademark Office duly issued the '004 Patent, titled "ECG Electrode Connector," on August 5, 2014.  A true and correct copy of the '004 Patent obtained from the U.S. Patent and Trademark Office's databases is attached as Exhibit 6.

48.     On July 28, 2017, KPR was assigned all right, title, and interest in the '004 Patent and remains the legal owner of the '004 Patent.

49.     CH is the exclusive licensee of the '004 Patent.

50.     The '004 Patent is valid, enforceable, and claims patentable subject matter.

51.     The LifeSync Defendants have infringed, and continue to infringe, certain claims of the '004 Patent under 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by making, using, selling, offering to sell, and/or importing ECG/EKG lead wires having closed-end electrode connectors, including the lead wires bearing product numbers LW-309DS50/5A, LW-309DS50/5AT, LW-309DS50/3A, LW-309DS50/4V, LW-309DS50/5V, LW-309DS50/6A, LW-309DS5/6AT, LW-341DS50/3A, LW-341DS50/5A, LW-341DS50/6A, LW-381DS50/3A, LW-381DS50/6A, LW-391DS50/3A and LW-391DS50/5A, as well as any materially similar products (collectively, the "'004 Accused Products")

52.     On information and belief, AME previously sold the '004 Accused Products and LifeSync now sells the '004 Accused Products.  However, any make, use, sale, offer to sell, or importation of the '004 Accused Products by the LifeSync Defendants infringes and has infringed the '004 Patent.

53.     The LifeSync Defendants have infringed and continue to infringe at least claims 1-2, 4-11, 13-14, and 16-17 of the '004 Patent.

54.     For example, claim 1 of the '004 Patent reads as follows:

**1.** An ECG connector assembly, comprising:

a housing having a first opening dimensioned to receive a press stud of an ECG electrode pad;

an electrical contact member fixed to the housing and defining a contact plane and having a second opening smaller than and disposed at least partially within the first opening; and

a lever pivotable about an axis orthogonal to the contact plane and having at least an engaged position and a disengaged position, wherein the lever comprises an actuating portion, an engaging region, and a pivot, the engaging region configured to operably engage the press stud to cause a portion of the press stud to contact the electrical contact member when the lever is in the engaged position.

55.     The '004 Accused Products include ECG connector assemblies meeting each limitation of claims 1-2, 4-11, 13-14, and 16-17 of the '004 Patent.  As one example, the LifeSync Defendants' products bearing product numbers LW-309DS50/5A and LW-309DS50/5AT include each element listed in claim 1.

56.     The LW-309DS50/5A and LW-309DS50/5AT products include an ECG connector assembly:



57.   The LW-309DS50/5A and LW-309DS50/5AT products include a housing having a first opening dimensioned to receive a press stud of an ECG electrode pad.  Each lead includes a white, plastic housing having an opening into the interior that is dimensioned to operably receive a press stud of a monitoring electrode pad:



58.   The LW-309DS50/5A and LW-309DS50/5AT products include an electrical contact member fixed to the housing and defining a contact plane and having a second opening smaller than and disposed at least partially within the first opening.  Each lead includes a metal electrical contact member (ECM) fixed to the housing and defining a plane and having an opening that is substantially concentrically aligned with and is smaller than and is disposed within the housing opening:



59.     The LW-309DS50/5A and LW-309DS50/5AT products include a lever pivotable about an axis orthogonal to the contact plane and having at least an engaged position and a disengaged position.  The lever is pivotably coupled to the housing and is pivotable orthogonal to the face plane of the ECM.  The lever has an engaged position (shown) and a disengaged position (e.g., by applying sufficient pressure to the lever):



60.     On the LW-309DS50/5A and LW-309DS50/5AT products, the lever further includes an actuating portion, an engaging region, and a pivot, the engaging region configured to operably engage the press stud to cause a portion of the press stud to contact the electrical contact member when the lever is in the engaged position.  A lever includes an actuating portion, a pivot, and an engaging region.  The lever is pivotably coupled to the housing at the pivoting end and is pivotable between an engaged position (shown) and a disengaged position.  By applying sufficient pressure to the actuating portion of the lever, the lever swings (about the

14

pivot) from an engaged position (shown) to a disengaged position so that the press stud is received upon insertion into the aperture and the engaging region retains the press stud against the ECM in the engaged position:



61.     The LifeSync Defendants' acts of infringement have cause damage to KPR and CH.  KPR and CH are entitled to recover from the LifeSync Defendants damages sustained as a result of the LifeSync Defendants' infringement of the '004 Patent.

62.     In particular, CH has lost profits from lost sales of its own ECG/EKG lead wires that include electrode connectors which embody claims of the '004 Patent due to the LifeSync Defendants' infringement.  There are no substantially non-infringing substitutes for the patented electrode connectors.

63.     Further, CH has suffered damages in the form of price erosion.  In response to the LifeSync Defendants' infringing activities, CH was forced to lower the prices of its own lead wires that include electrode connectors embodying claims of the '004 Patent in order to compete with the LifeSync Defendants' infringing lead wires.

64.     At a very minimum, KPR and CH are entitled to a reasonable royalty on sales of the LifeSync Defendants' infringing lead wires, together with interest and costs.

65.     Moreover, the LifeSync Defendants' infringements are and have been egregious and willful, entitling KPR and CH to treble damages.

15

66.    As early as January 18, 2019, AME has been on notice that at least certain of the '004 Accused Products infringe one or more claims of the '004 Patent.  Counsel for KPR and CH sent a letter to AME, detailing how certain of the '004 Accused Products infringe the '004 Patent and demanding that AME cease and desist all infringing conduct.  The letter included a copy of the '004 Patent together with example charts showing how certain of the '004 Accused Products meet the limitations of certain claims of the '004 Patent, totaling over 200 pages.  The January 18, 2019 letter is attached as Exhibit 2.

67.    On January 25, 2019, counsel for AME replied via letter, expressly acknowledging that AME had received the January 18, 2019 letter.  The January 25, 2019 letter is attached as Exhibit 3.

68.    On February 19, 2019, counsel for AME sent a more complete response via letter to the initial January 18, 2019 letter.  In the February 19, 2019 letter, AME: (a) acknowledged that KPR and CH accused three AME products of infringing the '004 Patent, and (b) denied liability.  The February 19, 2019 letter is attached as Exhibit 4.

69.    On March 7, 2019, counsel for KPR and CH responded to AME's February 19, 2019 letter, reaffirming that AME's products infringed the '004 Patent, refuting AME's various excuses for why it should not be liable for infringement, and restating the demand that AME cease and desist all infringing activities.  The March 7, 2019 letter is attached as Exhibit 5.

70.    Additionally, representatives for KPR and CH met in person with representatives for the LifeSync Defendants on April 17, 2019.

71.    Further still, counsel for KPR and CH and counsel for AME held a telephone conference on October 8, 2020, during which counsel for KPR and CH once again requested that AME discontinue its infringing activities.

72.     In light of the vast amounts of correspondence and discussions between the parties and their representatives, AME knows and has known how and why certain of the '004 Accused Products infringed the '004 Patent, at least since January 18, 2019.  Disregarding KPR's and CH's patent rights, AME pressed on with its infringement.  The LifeSync Defendants' infringement continues unabated to this day.

73.     On information and belief, in view of the close overlap of individuals associated with both AME and LifeSync, as well as AME and LifeSync operating out of the very same address, LifeSync had full knowledge that KPR and CH had accused certain AME products of infringement.  Accordingly, any infringements attributed to LifeSync are equally as egregious and willful as AME's infringements and subject LifeSync to treble damages in the same way as AME.

74.     The LifeSync Defendants' infringements warrant a finding that this is an exceptional case, entitling KPR and CH to recover their attorney fees and expenses.

**COUNT 3: 3M'S DIRECT INFRINGEMENT OF THE '484 PATENT**

75.     The U.S. Patent and Trademark Office duly issued the '484 Patent, titled "ECG Electrode Connector," on October 18, 2011.  A true and correct copy of the '484 Patent obtained from the U.S. Patent and Trademark Office's databases is attached as Exhibit 1.

76.     On July 28, 2017, KPR was assigned all right, title, and interest in the '484 Patent and remains the legal owner of the '484 Patent.

77.     CH is the exclusive licensee of the '484 Patent.

78.     The '484 Patent is valid, is enforceable, and claims patentable subject matter.

79.     3M has infringed, and continues to infringe, certain claims of the '484 Patent under 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by making, using,

selling, offering to sell, and/or importing ECG/EKG lead wires having closed-end electrode

connectors, including certain of the '484 Accused Products.

80.     3M advertises and offers on its website certain of the '484 Accused Products as

being made by AME and/or LifeSync at

https://multimedia.3m.com/mws/media/913507O/disposable-leadwire-solutions-for-ge-monitors-

flyer.pdf and https://multimedia.3m.com/mws/media/913471O/disposable-leadwire-solutions-

for-philips-monitors.pdf.  3M's website advertises a partnership with AME and/or LifeSync "to

bring you [the customer] a wide variety of disposable leadwire solutions" and depicts a lead wire

having infringing ECG electrode connectors.

81.     On information and belief, 3M has offered for sale, sold, and/or distributed certain

of the '484 Accused Products.

82.     3M has infringed and continues to infringe at least claims 3-11 of the '484 Patent.

83.     For example, claim 3 of the '484 Patent reads as follows:

**3.** An ECG connector assembly, comprising:

a housing having a first opening disposed therein dimensioned to operably
receive the press stud of an ECG electrode pad;

an electrical contact member defining a contact plane and having a second
opening disposed therein, the second opening disposed substantially
concentrically to the first opening, wherein the perimeter of the second
opening is less than the perimeter of the first opening; and

a lever pivotable about an axis orthogonal to the contact plane and disposed
within the housing and having at least an engaged position and a disengaged
position, wherein the lever further includes an actuating end, an engaging
region, and a pivot, the engaging region configured to operably engage a
narrow waist portion of the press stud and further configured to couple the
narrow waist portion of the press stud with the electrical contact member
when the lever is in the engaged position.

84.     The '484 Accused Products include ECG connector assemblies meeting each

limitation of claims 3-11 of the '484 Patent.  As one example, lead wires sold by 3M and

advertised as being compatible with the Philips Monitoring System are materially similar with respect to the electrode connectors to the LifeSync Defendants' products bearing product numbers LW-309DS50/5A and LW-309DS50/5AT:




Lead wires offered on 3M's website.       LifeSync Defendants' LW-309DS50/5A

85.    The '484 Accused Products sold or offered for sale by 3M infringe the '484 Patent for the same reasons as the LifeSync Defendants' products bearing product numbers LW-309DS50/5A and LW-309DS50/5AT.  As one example, the LifeSync Defendants' products bearing product numbers LW-309DS50/5A and LW-309DS50/5AT include each element listed in claim 3.

86.    The LW-309DS50/5A and LW-309DS50/5AT products include an ECG connector assembly:



87.     The LW-309DS50/5A and LW-309DS50/5AT products include a housing having a first opening disposed therein dimensioned to operably receive the press stud of an ECG electrode pad.  Each lead includes a white, plastic housing having an opening into the interior that is dimensioned to operably receive a press stud of a monitoring electrode pad:



88.     The LW-309DS50/5A and LW-309DS50/5AT products include an electrical contact member defining a contact plane and having a second opening disposed therein, the second opening disposed substantially concentrically to the first opening, wherein the perimeter of the second opening is less than the perimeter of the first opening.  Each lead includes a metal electrical contact member (ECM) defining a plane and having an opening that is substantially concentrically aligned with the housing opening and is smaller than the housing opening (thereby defining a smaller perimeter):



89.     The LW-309DS50/5A and LW-309DS50/5AT products include a lever pivotable about an axis orthogonal to the contact plane and disposed within the housing and having at least an engaged position and a disengaged position.  The lever is pivotably coupled to the housing and is pivotable orthogonal to the face plane of the ECM.  The lever is at least partially disposed within the housing.  The lever has an engaged position (shown) and a disengaged position (e.g., by applying sufficient pressure to the lever):



90.     On the LW-309DS50/5A and LW-309DS50/5AT products, the lever further includes an actuating end, an engaging region, and a pivot, the engaging region configured to operably engage a narrow waist portion of the press stud and further configured to couple the narrow waist portion of the press stud with the electrical contact member when the lever is in the engaged position.  The lever includes an actuating end, an engaging region, and a pivot.  By applying sufficient pressure to the actuating end of the lever, the lever swings (about the pivot) from a closed position (shown) to an open position so that the engaging portion engages (through mechanical engagement) the press stud and couples it with the ECM (when pressure is removed and the lever is closed and in the engaged position):



91.     3M's acts of infringement have caused damage to KPR and CH.  KPR and CH are entitled to recover from 3M damages sustained as a result of 3M's infringement of the '484 Patent.

92.     In particular, CH has lost profits from lost sales of its own ECG/EKG lead wires that include electrode connectors which embody claims of the '484 Patent due to 3M's infringement.  There are no substantially non-infringing substitutes for the patented electrode connectors.

93.     Further, CH has suffered damages in the form of price erosion.  In response to 3M's infringing activities, CH was forced to lower the prices of its own lead wires that include electrode connectors embodying claims of the '484 Patent in order to compete with 3M's infringing lead wires.

94.     At a very minimum, KPR and CH are entitled to a reasonable royalty on 3M's sales of infringing lead wires, together with interest and costs.

95.     Moreover, 3M's infringements are and have been egregious and willful, entitling KPR and CH to treble damages.

96.     On January 18, 2019, in-house counsel for CH sent a letter to 3M, attached as Exhibit 7.  The January 18, 2019 letter to 3M: (a) specifically identified the '484 Patent, (b) stated that 3M was "using, selling, offering for sale, importing, distributing, and/or advertising"

certain products of the LifeSync Defendants, (c) identified LifeSync Defendants' product numbers LW-309DS50, LW-341DS50, and LW-291DS50 "and any materially similar products" as infringing the '484 Patent, and (d) requested that 3M cease using, selling, offering for sale, importing, distributing, and advertising the infringing products.

97.     Further, before and following the January 18, 2019 letter to 3M, in-house counsel for CH and 3M attended multiple calls to discuss 3M's infringement.  But the issue was ultimately unresolved and to date, 3M's infringement persists.

98.     3M's infringements warrant a finding that this is an exceptional case, entitling KPR and CH to recover their attorney fees and expenses.

## COUNT 4: 3M'S DIRECT INFRINGEMENT OF THE '004 PATENT

99.     The U.S. Patent and Trademark Office duly issued the '004 Patent, titled "ECG Electrode Connector," on August 5, 2014.  A true and correct copy of the '004 Patent obtained from the U.S. Patent and Trademark Office's databases is attached as Exhibit 6.

100.     On July 28, 2017, KPR was assigned all right, title, and interest in the '004 Patent and remains the legal owner of the '004 Patent.

101.     CH is the exclusive licensee of the '004 Patent.

102.     The '004 Patent is valid, is enforceable, and claims patentable subject matter.

103.     3M has infringed, and continues to infringe, certain claims of the '004 Patent under 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by making, using, selling, offering to sell, and/or importing ECG/EKG lead wires having closed-end electrode connectors, including certain of the '004 Accused Products.

104.     3M advertises and offers on its website certain of the '004 Accused Products as being made by AME and/or LifeSync at

https://multimedia.3m.com/mws/media/913507O/disposable-leadwire-solutions-for-ge-monitors-flyer.pdf and https://multimedia.3m.com/mws/media/913471O/disposable-leadwire-solutions-for-philips-monitors.pdf.  3M's website advertises a partnership with AME and/or LifeSync "to bring you [the customer] a wide variety of disposable leadwire solutions" and depicts a lead wire having infringing ECG electrode connectors.

105.     On information and belief, 3M has offered for sale, sold, and/or distributed certain of the '004 Accused Products.

106.     3M has infringed and continues to infringe at least claims 1-2, 4-11, 13-14, and 16-17 of the '004 Patent.

107.     For example, claim 1 of the '004 Patent reads as follows:

> **1.** An ECG connector assembly, comprising:
>
> a housing having a first opening dimensioned to receive a press stud of an ECG electrode pad;
>
> an electrical contact member fixed to the housing and defining a contact plane and having a second opening smaller than and disposed at least partially within the first opening; and
>
> a lever pivotable about an axis orthogonal to the contact plane and having at least an engaged position and a disengaged position, wherein the lever comprises an actuating portion, an engaging region, and a pivot, the engaging region configured to operably engage the press stud to cause a portion of the press stud to contact the electrical contact member when the lever is in the engaged position.

108.     The '004 Accused Products include ECG connector assemblies meeting each limitation of claims 1-2, 4-11, 13-14, and 16-17 of the '004 Patent.  As one example, lead wires sold by 3M and advertised as being compatible with the Philips Monitoring System are materially similar with respect to the electrode connectors to the LifeSync Defendants' products bearing product numbers LW-309DS50/5A and LW-309DS50/5AT:

 

Lead wires offered on 3M's website.          LifeSync Defendants' LW-309DS50/5A

109.    The '004 Accused Products sold or offered for sale by 3M infringe the '004
Patent for the same reasons as the LifeSync Defendants' products bearing product numbers LW-309DS50/5A and LW-309DS50/5AT.  As one example, the LifeSync Defendants' products bearing product numbers LW-309DS50/5A and LW-309DS50/5AT include each element listed in claim 1.

110.    The LW-309DS50/5A and LW-309DS50/5AT products include an ECG connector assembly:



111.    The LW-309DS50/5A and LW-309DS50/5AT products include a housing having a first opening dimensioned to receive a press stud of an ECG electrode pad.  Each lead includes a white, plastic housing having an opening into the interior that is dimensioned to operably receive a press stud of a monitoring electrode pad:

25



112.    The LW-309DS50/5A and LW-309DS50/5AT products include an electrical contact member fixed to the housing and defining a contact plane and having a second opening smaller than and disposed at least partially within the first opening.  Each lead includes a metal electrical contact member (ECM) fixed to the housing and defining a plane and having an opening that is substantially concentrically aligned with and is smaller than and is disposed within the housing opening:



113.    The LW-309DS50/5A and LW-309DS50/5AT products include a lever pivotable about an axis orthogonal to the contact plane and having at least an engaged position and a disengaged position.  The lever is pivotably coupled to the housing and is pivotable orthogonal to the face plane of the ECM.  The lever has an engaged position (shown) and a disengaged position (e.g., by applying sufficient pressure to the lever):



114.   On the LW-309DS50/5A and LW-309DS50/5AT products, the lever further includes an actuating portion, an engaging region, and a pivot, the engaging region configured to operably engage the press stud to cause a portion of the press stud to contact the electrical contact member when the lever is in the engaged position.  A lever includes an actuating portion, a pivot, and an engaging region.  The lever is pivotably coupled to the housing at the pivoting end and is pivotable between an engaged position (shown) and a disengaged position.  By applying sufficient pressure to the actuating portion of the lever, the lever swings (about the pivot) from an engaged position (shown) to a disengaged position so that the press stud is received upon insertion into the aperture and the engaging region retains the press stud against the ECM in the engaged position:



115. 3M's acts of infringement have caused damage to KPR and CH. KPR and CH are entitled to recover from 3M damages sustained as a result of 3M's infringement of the '004 Patent.

116. In particular, CH has lost profits from lost sales of its own ECG/EKG lead wires that include electrode connectors which embody claims of the '004 Patent due to 3M's infringement. There are no substantially non-infringing substitutes for the patented electrode connectors.

117. Further, CH has suffered damages in the form of price erosion. In response to 3M's infringing activities, CH was forced to lower the prices of its own lead wires that include electrode connectors embodying claims of the '004 Patent in order to compete with 3M's infringing lead wires.

118. At a very minimum, KPR and CH are entitled to a reasonable royalty on 3M's sales of infringing lead wires, together with interest and costs.

119. Moreover, 3M's infringements are and have been egregious and willful, entitling KPR and CH to treble damages.

120. On January 18, 2019, in-house counsel for CH sent a letter to 3M, attached as Exhibit 7. The January 18, 2019 letter to 3M: (a) specifically identified the '004 Patent, (b) stated that 3M was "using, selling, offering for sale, importing, distributing, and/or advertising" certain products of the LifeSync Defendants, (c) identified the LifeSync Defendants' product numbers LW-309DS50, LW-341DS50, and LW-291DS50 "and any materially similar products" as infringing the '004 Patent, and (d) requested that 3M cease using, selling, offering for sale, importing, distributing, and advertising the infringing products.

121.    Further, before and following the January 18, 2019 letter to 3M, in-house counsel for CH and 3M attended multiple calls to discuss 3M's infringement.  But the issue was ultimately unresolved and to date, 3M's infringement persists.

122.    3M's infringements warrant a finding that this is an exceptional case, entitling KPR and CH to recover their attorney fees and expenses.

## PRAYER FOR RELIEF

WHEREFORE, KPR and CH respectfully request that the Court enter judgment in its favor, granting the following relief:

A.    Entry of a judgment that the LifeSync Defendants have infringed the '484 Patent under 35 U.S.C. § 271(a);

B.    Entry of a judgment that the LifeSync Defendants have infringed the '004 Patent under 35 U.S.C. § 271(a);

C.    Entry of a judgment that 3M has infringed the '484 Patent under 35 U.S.C. § 271(a);

D.    Entry of a judgment that 3M has infringed the '004 Patent under 35 U.S.C. § 271(a);

E.    Entry of a judgment that the LifeSync Defendants' infringement of the '484 Patent has been and continues to be egregious and willful;

F.    Entry of a judgment that the LifeSync Defendants' infringement of the '004 Patent has been and continues to be egregious and willful;

G.    Entry of a judgment that 3M's infringement of the '484 Patent has been and continues to be egregious and willful;

H.      Entry of a judgment that 3M's infringement of the '004 Patent has been and continues to be egregious and willful;

I.      Entry of an award to KPR and CH of damages adequate to compensate them for the infringement of the '484 Patent by the LifeSync Defendants and 3M, in an amount to be proven at trial, together with pre-judgment and post-judgment interest and costs, as fixed by the Court;

J.      Entry of an award to KPR and CH of damages adequate to compensate them for the infringement of the '004 Patent by the LifeSync Defendants and 3M, in an amount to be proven at trial, together with pre-judgment and post-judgment interest and costs, as fixed by the Court;

K.      Trebling the damages due to the LifeSync Defendants' and 3M's egregious and willful infringement under 35 U.S.C. § 284;

L.      Entry of a finding that, with respect to the LifeSync Defendants and 3M, this case has been exceptional and awarding to KPR and CH their reasonable costs and attorney fees under 35 U.S.C. § 285;

M.      Entry of judgment against the LifeSync Defendants and 3M on all counts of this Complaint;

N.      Entry of an award to KPR and CH of their costs in this action; and

O.      A grant to KPR and CH of other and further relief that the Court sees as just.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, KPR and CH demand trial by jury in this action of all issues so triable.

Dated: March 1, 2022              /s/ Christa C. Turner_____

Christa C. Turner
Florida Bar No. 0076627
BAKER & HOSTETLER LLP
200 South Orange Avenue, Suite 2300
Orlando, FL 32801
Telephone:    (407) 649-4000
Facsimile:     (407) 841-0168
Primary Email:  cturner@bakerlaw.com
Secondary email:  fapodaca@bakerlaw.com
                      orlbakerdocket@bakerlaw.com

Kevin W. Kirsch (*pro hac vice motion pending*)
kkirsch@bakerlaw.com
Andrew E. Samuels (*pro hac vice motion pending*)
asamuels@bakerlaw.com
BAKER & HOSTETLER LLP
200 Civic Center Drive, Suite 1200
Columbus, OH 43215
Telephone:    (614) 228-1541
Facsimile:     (614) 462-2616

David A. Mancino (*pro hac vice motion pending*)
dmancino@bakerlaw.com
Kevin P. Flynn (*pro hac vice motion pending*)
kflynn@bakerlaw.com
BAKER & HOSTETLER LLP
312 Walnut Street, Suite 3200
Cincinnati, Ohio 45202-4074
Telephone:    (513) 929-3400
Facsimile:     (513) 929-0303

*Attorneys for Plaintiffs*
*KPR U.S., LLC, and Cardinal Health 200, LLC*