UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-CV-60468-RAR

KPR U.S., LLC and
CARDINAL HEALTH 200, LLC,

     Plaintiffs,

v.

LIFESYNC CORPORATION, *et al.*,

     Defendants.

_____/

ADVANTAGE MEDICAL ELECTRONICS, LLC,

     Counter-Plaintiff,

v.

KPR U.S., LLC and
CARDINAL HEALTH 200, LLC,

     Counter-Defendants.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO DISMISS COUNTERCLAIMS AND STRIKE AFFIRMATIVE DEFENSES

**THIS CAUSE** comes before the Court on Plaintiffs' Motion to Dismiss Counterclaims and to Strike Defenses and Incorporated Memorandum of Law ("Mot.").   [ECF No. 115]. Plaintiffs KPR U.S., LLC ("KPR") and Cardinal Health 200, LLC ("Cardinal") ask the Court to dismiss Counts V, VI, VII, and XIV of Defendant Advantage Medical Electronics, LLC d/b/a Advantage Medical Cables' ("AMC") Second Amended Affirmative Defenses and Second Amended Counterclaims ("Second Am. Countercl.") [ECF No. 97].  *See* Mot. at 7–19.  Plaintiffs also move to strike the Fourth, Fifth, Seventh, Eighth, and Twelfth Affirmative Defenses which are asserted by all three Defendants.  *See id.* at 19–23.  Defendants filed a Response ("Resp.")

[ECF No. 120], and Plaintiffs filed a Reply to the Response ("Reply") [ECF No. 128]. After careful review of the relevant pleadings and the governing law, it is

ORDERED AND ADJUDGED that Plaintiffs' Motion, [ECF No. 115], is GRANTED in part and DENIED in part.

<u>BACKGROUND</u>

This patent case concerns the alleged infringement of two patents: United States Patent 8,038,484 ("'484 Patent") and United States Patent 8,795,004 ("'004 Patent"). *See* Second Amended Complaint ("Second Am. Compl.") [ECF No. 96] ¶ 1. Both Patents concern electrocardiogram ("ECG") electrode lead wire connectors which were designed to "provide[ ] improved electrical and mechanical coupling of the ECG electrode press stud to the lead wire, provide[ ] enhanced ergonomics to the clinician, and may alleviate patient discomfort associated with the attachment and removal of ECG leads." '484 Patent [ECF No. 96-1] at 2; '004 Patent [ECF No. 96-6] at 2. Plaintiff KPR has owned "all right[s], title, and interest[s]" in both Patents since July 28, 2017, and Plaintiff Cardinal is the exclusive licensee of both Patents. *See* Second Am. Compl. ¶¶ 20–21, 50–51. As relevant to the instant Motion, Plaintiffs accuse AMC and its related entity, Defendant LifeSync Corporation, of directly infringing on both Patents by "making, using, selling, offering to sell, and/or importing [ECG] lead wires having closed-end electrode connectors[.]" *Id.* ¶¶ 23, 53. Plaintiffs also accuse Defendant 3M of advertising and selling AMC and LifeSync's ECG lead wires which allegedly infringe on Plaintiffs' patents. *See id.* ¶¶ 83–85, 109–11.

Defendant AMC has responded with its own set of counterclaims against Plaintiffs. To summarize the counterclaims at issue, AMC asserts that (1) both the '484 Patent and the '004 Patent are unenforceable due to the inequitable conduct of the original patentee, Tyco Healthcare Group L.P. ("Tyco") (Counts V and VI), *see* Second Am. Countercl. ¶¶ 38–40, 166–77; (2)

Plaintiffs "engaged in the intentional mismarking of products . . . for the purpose of deceiving the public" (Count VII), *id.* ¶ 274; and (3) that U.S. Patent 8,152,571 ("'571 Patent"), a third patent held by Plaintiffs, is unenforceable due to inequitable conduct of Tyco (Count XIV), *see id.* ¶¶ 310–16. All Defendants also rely on the affirmative defenses of estoppel, waiver, unenforceability, unclean hands, and implied license (among others) to excuse their alleged infringement. *See id.* at 4–6, 7–8, 10–11; *see also* Defendant 3M's Answer to Second Amended Complaint [ECF No. 105] at 74–76, 77–78, 80–81; Defendant LifeSync's Answer to Second Amended Complaint [ECF No. 106] at 80–82, 84, 86–87.[1]

## LEGAL STANDARD

### I.  Rule 12(b)(6) Motion to Dismiss

To survive a 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept as true all factual allegations contained in the complaint, and the plaintiffs receive the benefit of all favorable inferences that can be drawn from the facts alleged. *See Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012); *Iqbal*, 556 U.S. at 678. A dismissal for failure to state a claim under Rule 12(b)(6) is a "judgment on the merits" and is "presumed to operate as a dismissal with prejudice unless the district court specifies otherwise." *Eiber Radiology, Inc. v. Toshiba Am. Med. Sys., Inc.*, 673 F. App'x 925, 929 (11th Cir. 2016) (citing *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 505 (2001)).

---

[1]  Since all three Defendants share the same affirmative defenses, the Court will exclusively cite to AMC's Second Amended Counterclaims when analyzing the merits of the affirmative defenses.

A court considering a 12(b)(6) motion is generally limited to the facts contained in the complaint and attached exhibits—but may also consider documents referred to in the complaint that are central to the claim and whose authenticity is undisputed. *See Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009). While the court is required to accept as true all allegations contained in the complaint, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678. "Dismissal pursuant to Rule 12(b)(6) is not appropriate unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Magluta v. Samples*, 375 F.3d 1269, 1273 (11th Cir. 2004) (citation and quotation omitted). And "determining whether a complaint states a plausible claim for relief is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Holland v. Carnival Corp.*, 50 F.4th 1088, 1093 (11th Cir. 2022) (alterations accepted) (quoting *Iqbal*, 556 U.S. at 679).

## II.    Motion to Strike Affirmative Defenses

"An affirmative defense is one that admits to the complaint, but avoids liability, wholly or partly, by new allegations of excuse, justification, or other negating matters." *Adams v. Jumpstart Wireless Corp.*, 294 F.R.D. 668, 671 (S.D. Fla. 2013) (citing *Royal Palm Sav. Ass'n v. Pine Trace Corp.*, 716 F. Supp. 1416, 1420 (M.D. Fla. 1989)). "A defense which points out a defect in the plaintiff's prima facie case is not an affirmative defense." *In re Rawson Food Serv.*, 846 F.2d 1343, 1349 (11th Cir. 1988). Instead, "affirmative defense[s] raise[] matters extraneous to the plaintiff's *prima facie case*; as such, they are derived from the common law plea of confession and avoidance." *Id.* (quoting *Ford Motor Co. v. Transp. Indem. Co.*, 795 F.2d 538, 546 (6th Cir. 1986)). A party may file a motion to strike an affirmative defense under Rule 12(f) of the Federal Rules of Civil Procedure if the affirmative defense is "redundant, immaterial, impertinent, or scandalous." *FAST SRL v. Direct Connection Travel LLC*, 330 F.R.D. 315, 317 (S.D. Fla. 2018)

(quoting FED. R. CIV. P. 12(f)).  However, as a general matter, motions to strike are "considered []

drastic remed[ies] and [are] often disfavored."  *SEC v. 1 Global Cap. LLC*, 331 F.R.D. 434, 437

(S.D. Fla. 2019).

Courts in this circuit "adhere to [two] different schools of thought[]" as it pertains to the

proper pleading standard for affirmative defenses.  *See FAST SRL*, 330 F.R.D. at 317.  "Some

courts have concluded that affirmative defenses are subject to the heightened pleading standard of

Rule 8(a), as set forth in [*Twombly* and *Iqbal*]," whereas "[o]ther courts have held that affirmative

defenses are subject to a less stringent standard under Rules 8(b) and 8(c), and that affirmative

defenses need only provide fair notice of the nature of the defense and the grounds upon which it

rests."  *1 Global Cap.*, 331 F.R.D. at 437 (internal quotation marks and citation omitted).  This

Court subscribes to the latter view.[2]  But no matter which standard the Court applies, affirmative

defenses should generally only be stricken with prejudice if they are "insufficient as a matter of

law. . . . Otherwise, district courts may strike the technically deficient affirmative defense without

prejudice and grant the defendant leave to amend the defense."  *Gomez*, 411 F. Supp. 3d at 1335.

## ANALYSIS

### I.    Unenforceability of the Patents (Counts V, VI, XIV and Seventh and Eighth Affirmative Defenses)

The majority of Plaintiffs' Motion is dedicated to addressing the enforceability of the '484,

'004, and '571 Patents.  According to AMC, all three Patents are unenforceable due to inequitable

conduct of the original patentee, Tyco, to disclose material "prior art" to the U.S. Patent and

---

[2]  In doing so, the Court notes that a growing majority of judges in this District have similarly found that Rule 8(b) and 8(c)'s pleading standards should apply to affirmative defenses instead of the Rule 8(a) *Twombly/Iqbal* standard.  *See, e.g.*, *1 Global Cap.*, 331 F.R.D. at 437–38 (Bloom, J.); *FAST SRL*, 330 F.R.D. at 318 (Martinez, J.); *Tsavaris v. Pfizer, Inc.*, 310 F.R.D. 678, 681–82 (S.D. Fla. 2015) (Moore, J.); *Sparta Ins. Co. v. Colareta*, No. 13-60579, 2013 WL 5588140, at *3 (S.D. Fla. Oct. 10, 2013) (Rosenbaum, J.); *but see Gomez v. Bird Auto., LLC*, 411 F. Supp. 3d 1332, 1337–38 (S.D. Fla. 2019) (Torres, Mag. J.) (applying *Twombly/Iqbal* standard to affirmative defenses).

Trademark Office ("USPTO") during the patent application process. *See generally* Second Am. Countercl. ¶¶ 33–37. As Defendants further explain in their Response, their position is that three Tyco patent attorneys who oversaw "separately or in combination" the submission of the USPTO applications that became the Patents —Winsor, Meagher, and Crowley—"intentionally withheld relevant and material prior art references" and "submitted numerous irrelevant and immaterial prior art references to the USPTO . . . to purposely bury the relevant and material prior art references from the patent examiner[.]" Resp. at 9. Plaintiffs argue that this Court should dismiss Counts V, VI, and XIV as "shotgun pleadings" and that Defendants have failed to plead the inequitable conduct counterclaims and affirmative defenses with the requisite particularity. *See* Mot. at 7, 14. The Court agrees with Plaintiff that Defendants have not surmounted the extremely high bar to show that the Patents are unenforceable due to Tyco's purported inequitable conduct.

### a. *Inequitable Conduct Standard*

The Constitution grants Congress the authority to "secur[e] for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. CONST. art. I, § 8, cl. 8. To secure that end, Congress created the USPTO and "tasked it with 'the granting and issuing of patents.'" *Return Mail, Inc. v. United States Postal Serv.*, 139 S. Ct. 1853, 1859 (2019) (quoting 35 U.S.C. §§ 1, 2(a)(1)). To obtain a patent, the inventor must submit an application to the USPTO which will then determine if "the claimed invention is useful, novel, nonobvious, and contains eligible subject matter." *Id.* (citing 35 U.S.C. §§ 101, 102, 103). "In evaluating whether these and other statutory conditions have been met, [USPTO] examiners must make various factual determinations—for instance, the state of the prior art in the field and the nature of the advancement embodied in the invention." *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 96 (2011). If the patentee's application meets all of the statutory requirements, the USPTO will issue a patent that "grants certain exclusive rights to its holder, including the exclusive right to use the

invention during the patent's duration." *Id.*  To enforce this right, that patentee can bring a "civil action for infringement" if another person "makes, uses, offers to sell, or sells any patent invention, within the United States." *Id.* (quoting 35 U.S.C. § 271(a)).

But an accused infringer is not without recourse if sued.  A defendant in a patent infringement suit "can attempt to prove by clear and convincing evidence 'that the patent never should have issued in the first place.'" *Return Mail*, 139 S. Ct. at 1859 (quoting *Microsoft Corp.*, 564 U.S. at 96–97).  An "inequitable conduct" defense, which is what Defendants rely upon, is one of the most potent defenses "because the penalty . . . is so severe, the loss of the entire patent even where every claim clearly meets every requirement of patentability."  *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1365 (Fed. Cir. 2008).  Although "the inequitable conduct doctrine evolved from [previous] unclean hands cases, it came to embrace a broader scope of misconduct, including not only egregious affirmative acts of misconduct intended to deceive both the [USPTO] and the courts but also the mere nondisclosure of information to the [USPTO]." *Therasense, Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011) (en banc).

To account for the wide scope of inequitable conduct (and its unforgiving remedy), the Federal Circuit has devised an extremely stringent standard for proving inequitable conduct.  The alleged infringer has the burden to prove, by clear and convincing evidence, that "the applicant (1) made an affirmative misrepresentation of material fact, failed to disclose material information, or submitted false material information, <u>and</u> (2) intended to deceive the [USPTO]." *Star Sci.*, 537 F.3d at 1365 (emphasis added) (quoting *Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359, 1364–65 (Fed. Cir. 2007)).  "Intent and materiality are separate requirements[,]" so the court must "weigh the evidence of intent to deceive independent of its analysis of materiality." *Therasense*, 649 F.3d at 1290.  In addition, since inequitable conduct is a fraud-based claim, the "particularity" requirement of FED. R. CIV. P. 9(b) applies, which requires the alleged infringer to identify "the

specific who, what, when, where, and how of the material representation or omission committed before the PTO." *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1327 (Fed. Cir. 2009).

Information is material when "a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." *Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279, 1297 (Fed. Cir. 2008). However, "the materiality required to establish equitable conduct is but-for materiality." *Therasense*, 649 F.3d at 1291. "[I]n assessing the materiality of a withheld reference, the court must determine whether the [USPTO] would have allowed the claim if it had been aware of the undisclosed reference." *Id.* In other words, the nondisclosure of prior art references or the failure to mention prior art references in an affidavit do not meet the materiality standard unless the USPTO would not have granted the patent application "but-for" the disclosure of the prior art. *See id.* at 1292–93; *see also Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333, 1345 (Fed. Cir. 2013) ("Typically, an allegation of inequitable conduct before the PTO requires proof that the patentee withheld or misrepresented information that, in the absence of the withholding or misrepresentation, would have prevented a patent claim from issuing."). Nor would the nondisclosure of prior art be material if it is "merely cumulative" of other prior art that was already put before the USPTO. *Regeneron Pharms., Inc. v. Merus N.V.*, 864 F.3d 1343, 1350 (Fed. Cir. 2017). The one exception to the "but-for" materiality rule is when the patentee engages in "affirmative egregious misconduct," such as when the patentee files "an unmistakably false affidavit." *Therasense*, 649 F.3d at 1292; *see also Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, 695 F.3d 1285, 1294 (Fed. Cir. 2012) (holding that a "false affidavit or declaration is per se material").[3]

---

[3] Since the "affirmative egregious standard," by its very definition, requires the infringer to show that the patentee intended to provide false information to the USPTO, the infringer will meet both the materiality and intent requirements by showing clear and convincing evidence that the patentee engaged in affirmative egregious misconduct. *See 1st Media, LLC v. Elec. Arts, Inc.*, 694 F.3d 1367, 1372 (Fed. Cir. 2012).

The accused infringer must also show that the patentee intended to deceive the USPTO. This prong is met when there is clear and convincing evidence that the applicant "knew of [a] reference, knew that it was material, and made a <u>deliberate</u> decision to withhold it." *Therasense*, 649 F.3d at 1290 (emphasis added). Although intent can be inferred from direct, indirect, and circumstantial evidence, "the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.'" *Id.* (quoting *Star Sci.*, 537 F.3d at 1366); *see also Ohio Willow Wood*, 735 F.3d at 1351 (explaining that "intent to deceive cannot be found" when "multiple reasonable inferences" can be drawn from the evidence). "A finding that the misrepresentation or omission amounts to gross negligence or negligence under a 'should have known' standard does not satisfy this intent requirement." *Id.*

### b. *Defendants Have Failed to Plead Inequitable Conduct*

So, what do AMC and the other Defendants have to prove to rely on an inequitable conduct defense? Even though the Court must assume that all of the facts alleged by Defendants are true at this stage of the proceedings, *see Chaparro*, 693 F.3d at 1338, Defendants must still "recite facts from which the court may reasonably infer" that there is clear and convincing evidence that individuals working for Tyco "both knew of invalidating information that was withheld from the PTO and withheld that information with a specific intent to deceive the PTO[,]" *Delano Farms Co. v. Cal. Table Grape Comm'n*, 655 F.3d 1337, 1350 (Fed. Cir. 2011).[4] All of Defendants' allegations must also be sufficiently particular so that the Court can discern the "who, what, when, where, and how of the material representation or omission committed before the PTO." *Exergen Corp.*, 575 F.3d at 1327. Plaintiffs maintain that AMC has failed to plead Counts V, VI, and XIV

---

[4] Defendants do not allege that Tyco engaged in "affirmative egregious misconduct" during the application process, so the Court will not address that exception in this Order.

with the particularity required by Rule 9(b).  *See* Mot. at 7–8.  In the alternative, Plaintiffs argue that Defendants' pleadings are replete with "conclusory, vague, and immaterial facts" which prevent Defendants from advancing a facially sufficient inequitable conduct defense.  *See id.* at 15.  The Court agrees with Plaintiffs that Defendants have not shown, with the requisite particularity, that any of Tyco's employees acted with a specific intent to defraud the USPTO.

To start, the Court must first deduce the specific inequitable conduct which (according to Defendants) renders the '484, '004, and '571 Patents unenforceable.  This is not an easy task.  As Plaintiffs correctly argue, the Second Amended Counterclaim "contain[s] dozens of allegations of immaterial or inconsequential facts."  Mot. at 14.  For example, Count VI contains over fifty paragraphs "pertaining to the prosecution of [other] patent applications distinct from the '004 Patent."  Mot. at 16; *see generally* Second Am. Countercl. ¶¶ 176–239.  The Court understands that some of Defendants' references to other patent applications are relevant to establish "a pattern of conduct from which an intention to deceive the USPTO may be inferred," Resp. at 13, but many of the references have no obvious or apparent connection to the inequitable conduct that purportedly tainted the '484, '004, and '571 Patents.  The Court will not, however, follow Plaintiffs' recommendation to dismiss Counts V, VI, and XIV as "shotgun pleadings."  While the Court agrees that the Second Amended Counterclaim is not particularly well-pled, it also finds that AMC's pleading does not qualify under any of the four categories of shotgun pleadings identified by the Eleventh Circuit as violating the Federal Rules of Civil Procedure.  *See Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1321–23 (11th Cir. 2015).  In any event, Counts V, VI, XIV suffer from greater substantive defects.

Though the Second Amended Counterclaim is not a model of clarity, the Court discerns

the following allegations concerning each patent:[5]

> Count V ('484 Patent) – Attorney Winsor submitted an Information Disclosure
> Statement on December 9, 2008, which identified only "a single patent reference
> and one non-patent literature document [known as the 'Kendall Brochure']."
> Second Am. Countercl. ¶ 89. According to AMC, Winsor should have referenced:
> (1) Schwarz U.S. Patent No. 6,780,065 (the "Schwarz Patent"), (2) and a German
> patent, published as No. DE19801173 (C1), which was owned by a German
> subsidiary of Tyco, Kendall Med (the "Kendall Patent"). *See id.* ¶¶ 93–95, 152–
> 55. Attorney Winsor knew about these patents because she had referenced both in
> other patent applications filed by Tyco. *See id.* ¶¶ 121–32, 152–53. Winsor
> purposely failed to disclose the Schwarz Patent and the Kendall Patent because, if
> they were disclosed, the USPTO would not have granted the '484 Patent application
> since it would have been obvious under 35 U.S.C. § 103. *Id.* ¶ 138. AMC also says
> that a different attorney, Meagher, was also aware of the Kendall Patent but did not
> disclose it to the USPTO. *See id.* ¶ 133–37.

> Count VI ('004 Patent) – While supervised by Winsor, Attorney Crowley submitted
> an Information Disclosure Sheet in connection with the '004 Patent's application
> which referenced over 450 patents from around the world. *Id.* ¶ 245–48. Many of
> those patents had nothing to do with electrodes and had no apparent connection to

---

[5] Plaintiffs contend that Defendants have "fail[ed] to allege 'who' committed inequitable conduct." Mot. at 8. As proof of this proposition, Plaintiffs point to large swaths of the Second Amended Counterclaim that contain "catchall provisions" which ascribe the inequitable conduct to "Tyco Healthcare's employees and/or attorneys involved in the filing and prosecution" of the respective Patents. *Id.*; *see, e.g.*, Second Am. Countercl. ¶¶ 101, 103–06, 122–23, 136–38, 151, 159–61, 253, 264, 310, 315, 325–27. Defendants respond that they have specifically identified alleged inequitable conduct that was committed by three attorneys associated with Tyco: Winsor, Meagher, and Crowley. *See* Resp. at 12–13. The Court agrees with Defendants that the portions of the Second Amended Counterclaim which specifically discuss the conduct of Winsor, Meagher, and Crowley are adequately particular under Rule 9(b). That said, however, the Court <u>will not</u> consider any inequitable conduct that Defendants attribute to other unnamed or unidentifiable persons since those allegations are not sufficiently pled. *See Exergen*, 575 F.3d at 1329 ("[T]he pleading refers generally to 'Exergen, its agents and/or attorneys,' but fails to name the specific individual . . . who both knew of the material information and deliberately withheld or misrepresented it. The pleading thus fails to identify the 'who' of the material omissions and misrepresentation."); *Mitsubishi Heavy Indus., Ltd. v. General Elec. Co.*, No. 6:10-CV-812, 2012 WL 831525, at *2 (M.D. Fla. Mar. 12, 2012) (rejecting use of "the double and/or conjunction" since it was "impossible to determine who is alleged to have been engaged in deceptive conduct"); *Lederer v. Avotec, Inc.*, No. 18-14160, 2018 WL 8264560, at *4 (S.D. Fla. Aug. 17, 2018) ("Although Lederer is a specific individual, Avotec does not specifically identify the Lederer's 'representatives' whom Avotec alleges committed the material misrepresentations or omissions."). The Court concurs with Plaintiffs that Defendants cannot refer to unknown persons as a placeholder so that they can later use discovery to identify these hypothetical bad actors. *See In re BP Lubricants USA Inc.*, 637 F.3d 1307, 1310 (Fed. Cir. 2011) ("Rule 9(b) acts as a safety valve to assure that only viable claims alleging fraud or mistake are allowed to proceed to discovery. By eliminating insufficient pleadings at the initial stage of litigation, Rule 9(b) prevents relators using discovery as a fishing expedition.").

the '004 Patent.  *Id.* ¶¶ 248–50.  The Information Disclosure Sheet referenced the Schwarz Patent and Grunwald U.S. Patent No. 4,303,293 (the "Grunwald Patent"), both of which were material to the '004 Patent.  *See id.* ¶ 254–55, 258–59.  Both Winsor and Crowley knew about these patents because they had referenced these patents in other applications, and knew that, if they were discovered, the USPTO would grant the '004 Patent's application.  *See id.* ¶¶ 256–58.  To avoid this, Winsor and Crowley purposely "buried" the Schwarz and Grunwald Patents amongst a sea of irrelevant patents so that the USPTO examiner could not discover their materiality to the '004 Patent.  *See id.* ¶¶ 260–66.

Count XIV ('571 Patent) – Defendants repeat several of their claims from Count V: that Winsor knew about the Schwarz Patent, that Winsor knew that Schwarz Patent was material to the '571 Patent, the USPTO would not have granted the '571 Patent application if it knew about the Schwarz Patent, and that Winsor purposely did not disclose the Schwarz Patent because of its materiality.  *See generally id.* ¶¶ 309–24.

To make a long story short, the Court must determine if the following conduct was sufficiently inequitable as to justify invalidating the Patents: (1) for Count V, Winsor and Meagher's failure to disclose the Schwarz Patent and Kendall Patent to the USPTO; (2) for Count VI, Winsor and Crowley's decision to "bury" the Grunwald Patent and Schwarz Patent amongst other irrelevant references so that the USPTO examiner could not easily discover their materiality; and (3) for Count XIV, Winsor's decision not to disclose the Schwarz Patent to the USPTO.

The Court will start with the non-disclosure of the Schwarz Patent—which underpins both Count V and Count XIV.  Defendants claim that the Schwarz Patent was material to the patentability of the '484 Patent and the '571 Patent, and that neither patent application would have been granted if the Schwarz Patent was disclosed to the USPTO.  *See* Second Am. Countercl. ¶¶ 152–61, 317–22.  As proof that this nondisclosure was intentional and fraudulent, Defendants explain that Winsor had cited Schwarz in many other patent applications she had prepared for Tyco.  *See generally id.* ¶¶ 63–85.  This is insufficient to prove that Winsor had the intent to deceive the USPTO.  As the Federal Circuit has repeatedly held, "[t]he mere fact that an applicant disclosed a reference during prosecution of one application, but did not disclose it during the

prosecution of a related application, is insufficient to meet the threshold level of deceptive intent required to support an allegation of inequitable conduct." *Exergen*, 575 F.3d at 1331; *see also Therasense*, 649 F.3d at 1290 ("Proving that the applicant knew of a reference, should have known of its materiality, and decided not to submit it to the PTO does not prove specific intent to deceive.").[6]

To counter this binding precedent from the Federal Circuit, Defendants also allege that "Winsor was well aware of this reference specifically, and knew of its contents and relevancy," so the Court should conclude that Winsor specifically knew about the Schwarz Patent's materiality and that Winsor's fraudulent intent is the only reasonable explanation for why it was not disclosed to the USPTO.  Resp. at 13 (citing Second Am. Countercl. ¶¶ 63–68, 70–75, 77–80, 85, 145, 155, 321); *cf. DS Smith Plastics Ltd. v. Plascon Packaging, Inc.*, No. 15-C-5760, 2016 WL 69632, at *6–7 (N.D. Ill. Jan. 6, 2016) (finding that patent lawyers' "oversight of the application filing of many of the prior art references" was sufficient to allege knowledge of the prior art's materiality and an intent to deceive the USPTO through non-disclosure).  But this is still not enough.  Even if Winsor knew that the Schwarz Patent was material to <u>some</u> of Tyco's patent applications, Defendants never allege "that the applications described in Paragraphs 63–85 have claims materially similar to the claims of the '484 Patent or the '571 Patent."  Mot. at 10.  In other words, the mere fact that Winsor knew about the Schwarz Patent and disclosed its existence in other patent applications is not evidence that Winsor knew (or even should have known) that the Schwarz Patent <u>would have also been a material reference</u> for the '484 and '571 Patents.  *See Giuliano v.*

---

[6]  The Federal Circuit has been reluctant to find an intent to deceive the USPTO when an applicant does not disclose a reference in one application but then discloses the same reference in another application that is pending at the same time.  *See Akron Polymer Container Corp. v. Exxel Container, Inc.*, 148 F.3d 1380, 1384 (Fed. Cir. 1998) ("Exxel contends, we think convincingly, that it hardly could be seeking to deceive the PTO as to the existence of copending applications when it actually disclosed the fact of copendency to the Venus examiner.").

*SanDisk Corp.*, 224 F. Supp. 3d 851, 870 (N.D. Cal. 2016) ("Simply because counsel considered the Simko patents relevant in a prior, unrelated patent prosecution does not suggest that he knew those patents were material to the '338 patent."); *Vaughan Co. v. Global Bio-Fuels Tech., LLC*, No. 12-CV-1292, 2013 WL 5755389, at *7 (N.D.N.Y. Oct. 23, 2013) ("Instead, defendants offer only conclusory allegations that the mere nondisclosure of information to the PTO suggests such was done with specific intent to deceive.  This is not enough to establish, by clear and convincing evidence, the threshold showing of inequitable conduct or to justify the drastic remedy of a declaration of unenforceability.").  The Court finds that Defendants have failed to allege that Winsor had a specific intent to defraud the USPTO by failing to disclose the Schwarz Patent when applying for the '484 and '571 Patents.

The non-disclosure of the Kendall Patent during the '484 Patent application fares no better. Unlike the Schwarz Patent, Defendants concede that Winsor and Meagher provided the UPSTO with the "Kendall Brochure" which "display[ed] a universal connector to fit snap and TAB electrodes" and "referred to the universal connector as the N91 Tab Adapter."  Second Am. Countercl. ¶ 116.  But Defendants maintain that the Kendall Brochure was insufficient to display the materiality of the Kendall Patent since it "failed to provide an enabling disclosure of the N91 Electrode Connector" and "failed to describe how the N91 Electrode Connector operated to connect to a push-button shaped connect part."  *Id.* ¶¶ 117–18.

This argument borders on frivolity.  Winsor and Meagher indisputably disclosed the existence of the all-important "N91 Electrode Connector" to the USPTO.  The fact that Winsor and Meagher did not disclose the Kendall Patent—which arguably included more information than the Kendall Brochure about the N91 Electrode Connector—does not even suggest malintent.  *See Fiskars, Inc. v. Hunt Mfg. Co.*, 221 F.3d 1318, 1327 (Fed. Cir. 2000) ("An applicant cannot be guilty of inequitable conduct if the reference was cited to the examiner[.]"); *see also ParkerVision,*

*Inc. v. Qualcomm Inc.*, 924 F. Supp. 2d 1314, 1319 (M.D. Fla. 2013) ("Here, the PTO was aware of the Parssinen reference, as evidenced by the reference's citation on the face of the patent, and still issued the patent.  One cannot assume that a PTO examiner is an ignorant rube who is easily misled by attorney argument, hyperbole, or understatement.").[7]  In addition (and in contrast to the Schwarz Patent), Defendants never explain how the failure to disclose the Kendall Patent was material to the issuance of the '484 Patent.  *See Exergen*, 575 F.3d at 1329–30 (holding that the alleged infringer must "explain both 'why' the withheld information is material and not cumulative, and 'how' an examiner would have used this information in assessing the patentability of the claims").  Thus, the failure to disclose the Kendall Patent was neither material nor was it indicative of an intent to deceive.

Finally, Defendants' "burying" argument has been consistently rejected by courts around the country.  Although Defendants admit that Winsor and Crowley disclosed the Grunwald Patent and the Schwarz Patent to the USPTO during the '004 Patent application process, they contend that this disclosure was illusory since it was disclosed along with hundreds of other patents—many of which were irrelevant to the '004 Patent.  *See* Second Am. Countercl. ¶¶ 245–48.  Defendants explain that this was a tactical decision by Winsor and Crowley to "bury" the USPTO examiner with superfluous references since, as a practical matter, a patent examiner would not have enough time to discover the Grunwald and Schwarz Patents and their relevance to the application.  *See id.* ¶¶ 250–52.

Although the practice of "burying" PTO examiners is frowned upon, the Federal Circuit recognizes that it is done to avoid accusations from alleged infringers (like Defendants in this case)

---

[7] Disclosing both the brochure and the patent would have, arguably, also been redundant and unnecessarily cumulative.  *See Nova Biomedical Corp. v. Mallinckrodt Sensor Sys., Inc.*, 997 F. Supp. 187, 191–92 (D. Mass. 1998) (rejecting argument that the failure to disclose a brochure to the USPTO was material since it was cumulative of an already disclosed patent).

that a patent was secured by inequitable conduct.  *See Therasense*, 649 F.3d at 1289 ("Because allegations of inequitable conduct are routinely brought on 'the slenderest grounds,' patent prosecutors constantly confront the specter of inequitable conduct charges.  With inequitable conduct casting the shadow of a hangman's noose, it is unsurprising that patent prosecutors regularly bury PTO examiners with a deluge of prior art references, most of which have marginal value." (internal citation omitted)).  This unfortunate reality in the world of patent litigation means that "burying" material references is not recognized as proof of a "specific intent to deceive" the USPTO.  *See, e.g.*, *ParkerVision*, 924 F. Supp. 2d at 1318 ("Because specific intent to deceive is not the only or single most reasonable inference to be drawn from the disclosure of voluminous references to the PTO, Qualcomm's pleading of the 'burying' theory fails as a matter of law."); *Symbol Tech., Inc. v. Aruba Networks, Inc.*, 609 F. Supp. 2d 353, 358–59 (D. Del. 2009) ("The Court thus concludes that, under Federal Circuit caselaw and the relevant regulations, Defendant's [argument that 'burying' a reference can be probative of bad faith] is insufficient as a matter of law."); *ESCO Corp. v. Cashman Equipment Co.*, 158 F. Supp. 3d 1051, 1062–63 (D. Nev. 2016) ("Since it is undisputed that the disclosures were made by ESCO to the PTO, deceptive intent, if any, could only be inferred from the volume of the documents that were submitted contemporaneously with the invalidity contentions.  This inference proves too much.  There are no facts alleged that negate an equally reasonable inference: that ESCO was attempting to avoid being accused of inequitable conduct for failing to disclose enough references.").  Thus, Defendants have failed to allege that Winsor and Crowley had the intent to deceive the USPTO merely because they "buried" material references.

Defendants have failed to show that the '484, '004, or '571 Patents were procured by inequitable conduct.  The failure to disclose the Schwarz Patent and the Kendall Patent is not suggestive of a coordinated attempt to defraud the USPTO.  And AMC's belief that Winsor and

Crowley "buried" the Schwarz and Grunwald Patents is insufficient to prove intent as a matter of law. For these reasons, the Court will **DISMISS with prejudice** Counts V, VI, and XIV of the Second Amended Counterclaim.

### c. *The Seventh and Eighth Affirmative Defenses*

All Defendants share the same Seventh and Eighth Affirmative Defenses. The Seventh Affirmative Defense is that the '484 and '004 Patents are unenforceable "for the reasons alleged with particularity in AMC's Fifth, Sixth, and Fourteenth Amended Counterclaims." Second Am. Countercl. at 7. Defendants' Eighth Affirmative Defense is that Plaintiffs have "unclean hands" since they "have nevertheless continued to press their unfounded claims of infringement" despite having knowledge of their inequitable conduct. *Id.* at 8. As the Court exhaustively discussed *supra*, Defendants have failed to show that the '484 or '004 Patents are unenforceable, and, therefore, they also cannot show that Plaintiffs "engaged in [the] particularly egregious conduct" needed to justify an unclean hands defense. *Serdarevic v. Advanced Med. Optics, Inc.*, 532 F.3d 1352, 1361 (Fed. Cir. 2008). For these reasons, the Court will **STRIKE** Defendants' Seventh and Eighth Affirmative Defenses.

## II.    False Marking (Count VII)

Next, AMC alleges that Plaintiffs have falsely marked their "Kendall DL Disposable Cables & Lead Wire System products, including, without limitation, its product code No. 33135T 5 lead dual connect system" ("Cardinal System") by affixing references to the '484 and '004 Patents on it. Second Am. Countercl. ¶ 270. AMC explains that "[r]elative to the '484 Patent, the Cardinal System lacks, among other things: a level disposed within the housing and having an engaging region configured to operably engage a narrow waist portion of the press stud, as required by Claim 3, and a cam, as required by Claim 4." *Id.* ¶ 272. Whereas "[r]elative to the '004 Patent, the Cardinal System lacks, among other things: an electrical contact member having an opening

smaller than and disposed at least partially within an opening of a housing, as required by Claim 1, and an electric contract member having a contact opening that is at least partially exposed within an aperture of a housing, as required by Claim 13." *Id.* ¶ 273.  AMC asserts these false marks were intentional "for the purpose of deceiving the public" and to discourage competition for legitimate competitive products. *See id.* ¶¶ 274–76.  Plaintiffs respond that AMC has neither pled a "competitive injury" caused by the false marking, nor a "specific intent to deceive the public." Mot. at 18.

    "Whoever . . . marks upon, or affixes to, or uses in advertising . . . the name of the patentee, the patent number, or the words 'patent,' 'patentee,' or the like, with the intent of counterfeiting or imitating the mark of the patentee, or of deceiving the public" has engaged in false marking.  35 U.S.C. § 292(a).  There are two elements to a false marking claim: "(1) marking an unpatented article and (2) intent to deceive the public." *Forest Grp., Inc. v. Bon Tool Co.*, 590 F.3d 1295, 1300 (Fed. Cir. 2009).  "[A] person must show they have 'suffered a competitive injury' to recover false marking damages." *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1364 (Fed. Cir. 2012) (citing 35 U.S.C. § 292(b)).  "When the statute refers to an 'unpatented article' the statute means that the article in question is not covered by at least one claim of each patent with which the article is marked." *Clontech Lab'y, Inc. v. Invitrogen Corp.*, 406 F.3d 1347, 1352 (Fed. Cir. 2005).  "The bar for proving deceptive intent . . . is particularly high," as it requires evidence that the false mark was placed with the specific and conscious desire to deceive the public. *Pequignot v. Solo Cup Co.*, 608 F.3d 1356, 1363 (Fed. Cir. 2010).  Although the burden of proof for a party "asserting false marking" is merely a preponderance of the evidence standard, *see Forest Grp.*, 590 F.3d at 1300, a false marking claim must still be plead with the same particularity under Rule 9(b) as an inequitable conduct claim, *see In re BP Lubricants*, 637 F.3d at 1312.

The Court agrees with Plaintiffs that AMC's false marking claim is insufficient.  AMC makes only bare conclusory allegations that the alleged mismarking was done "for the purpose of deceiving the public" and that AMC "has suffered a competitive injury" due to the patent mismarking.  Second Am. Countercl. ¶¶ 274, 276.  AMC does not proffer, for instance, "facts with particularity that would allow the Court to reasonably infer [a] specific intent to deceive the public" or how AMC suffered a competitive injury because of the false marking.  Mot. at 18; *see, e.g.*, *Tech. Med. Advancements, LLC v. Advanced Med. Distribs.*, No. 15-80194, 2015 WL 11438210, at *4 (S.D. Fla. Oct. 2, 2015) ("Consequently, the Court finds that, because the AMD Defendants have alleged nothing more than a likely or potential injury to unidentified persons or companies, they have not pled sufficient facts to plausibly assert that Plaintiff's false marking resulted in actual competitive injury.").[8]  The Court rejects AMC's counterargument that the factual circumstances alleged in their pleadings "give rise to the natural and logical inference that Plaintiffs' patent mismarking was performed with the intent to deceive the public[.]"  Resp. at 23.  The mere use of a false mark, without more, is insufficient for the Court to infer deceptive intent.  *See Pequignot*, 608 F.3d at 1363 ("Thus, mere knowledge that a marking is false is insufficient to prove intent if Solo can prove that it did not consciously desire the result that the public be deceived."); *Advanced Cartridge Techs., LLC v. Lexmark Int'l, Inc.*, No. 8:10-CV-486, 2010 WL 2640137, at *1 (M.D. Fla. June 30, 2010) ("The complaint alleges that the defendant 'marks patent numbers on toner cartridge products for imaging devices' and that the defendant 'knows, or reasonably should know, that marking the Cartridge Products with patents that do not cover the Cartridge Products, or

---

[8]  AMC states that "establishing a competitive injury" is not an element of a false marking claim, and so it does not need to be pled with specificity at this stage of the proceedings.  Resp. at 22.  This is false and has been false since the passage of the Leahy-Smith American Invents Act in 2011.  *See Presidio Components*, 702 F.3d at 1364.

patents that are invalid or expired, will deceive the public.'  Providing only sparse factual detail, the complaint utterly fails to state with particularity the circumstances constituting fraud.").

However, unlike Counts V, VI, and XIV, the Court believes that Count VII's procedural deficiencies can be remedied.  *See, e.g.*, *Tech. Med. Advancements*, 2015 WL 11438210, at *6 (dismissing false marking claims without prejudice and granting leave to amend).  The Court will thus **DISMISS** Count VII **without prejudice** and provide AMC with an opportunity to advance a legally sufficient false marking claim.

### III.    The Other Affirmative Defenses

Plaintiffs also seek to strike Defendants' Fourth (estoppel), Fifth (waiver), and Twelfth (implied license) Affirmative Defenses.  *See* Mot. at 1.[9]  Defendants' Fourth Affirmative Defense alleges that Plaintiffs undertook certain actions before filing suit which led Defendants "to reasonably conclude that Plaintiffs no longer considered the '484 Accused Products and the '004 Accused Products to infringe either the '484 Patent and the '004 Patent[.]"  Second Am. Countercl. at 4.  The Fifth Affirmative Defense asserts that Plaintiffs "intentionally and knowingly waived any right to relief" by purchasing and selling Defendants' accused products years before filing suit.  *See id.* at 5–6.  Finally, in the Twelfth Affirmative Defense, Defendants argue that they had an "implied license to practice the '484 Patent and '004 Patent" because Plaintiffs "have been regularly purchasing and reselling certain of the '484 Accused Products and the '004 Accused Products since at least as early as 2016, and have continued to purchase and resell such products

---

[9] Defendants 3M and LifeSync argue that Plaintiffs' attempt to strike their affirmative defenses is untimely. *See* Resp. at 8.  Even if the Motion was untimely, the Court agrees with Plaintiffs that this two-day delay is excusable, that Plaintiffs acted in good-faith, and that Defendants were not prejudiced by Plaintiffs' delay in filing the motion to strike.  *See* Reply at 12–13 (citing FED. R. CIV. P. 6(b)(1)(B)).  Accordingly, the Court will consider the Motion to Strike against all Defendants.

after Plaintiffs' filing of the Complaint and the First Amended Complaint." *Id.* at 10.  After careful review, the Court concludes that these three affirmative defenses should not be stricken.

All three affirmative defenses have similar elements.   To prove equitable estoppel, the alleged infringer must show: "(1) the patentee, through misleading conduct, led the infringer to reasonably believe that the patentee did not intend to enforce its patent against the infringer; (2) the alleged infringer relied on that conduct; and (3) due to its reliance, the alleged infringer would be materially prejudiced if the patentee was permitted to proceed with its charge of infringement." *Aspex Eyewear Inc. v. Clariti Eyewear, Inc.*, 605 F.3d 1305, 1310 (Fed. Cir. 2010).

Waiver, on the other hand, can be proven in two different ways: there can be evidence that the patentee "intended to voluntary waive its patent rights" ("true waiver") or the patentee fails to assert its patent rights "in the face of a duty to speak" ("implied waiver").   *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1020–21 (Fed. Cir. 2008); *accord Am. Technical Ceramics Corp. v. Presidio Components, Inc.*, 414 F. Supp. 3d 304, 314 (E.D.N.Y. 2019).  The primary difference between an estoppel and waiver defense is that estoppel requires a "detrimental reliance" on the patentee's conduct.   *See Glass v. United of Omaha Life Ins. Co.*, 33 F.3d 1341, 1347 (11th Cir. 1994).

An implied license requires a showing that: "(1) a relationship existed between plaintiff and defendant; (2) within that relationship, plaintiff granted defendant a right to use plaintiff's patents; (3) plaintiff received valuable consideration for the grant of right; (4) plaintiff's statements and conduct created the impression that plaintiff consented to defendant's use of plaintiff's patents; and (5) plaintiff denied that defendant had an implied license."   *TruePosition, Inc. v. Andrew Corp.*, 568 F. Supp. 2d 500, 522 (D. Del. 2008) (citing *Wang Lab'y, Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571, 1579 (Fed. Cir. 1997)).  An implied license differs from estoppel (and waiver) because an "implied license looks for an <u>affirmative grant</u> of consent or permission to make, use,

or sell: i.e., a license[,]" whereas estoppel "focuses on 'misleading' conduct suggesting that the patentee will not enforce patent rights." *Wang*, 103 F.3d at 1581 (emphasis added). That said, "an implied license may arise by equitable estoppel" if the patentee "g[ives] an affirmative grant of consent or permission to make, use, or sell to the alleged infringer" through its statements or conduct. *Winbond Elecs. Corp. v. Int'l Trade Comm'n*, 262 F.3d 1363, 1374 (Fed. Cir. 2001).

Defendants rely on the same set of facts for all three affirmative defenses: Plaintiffs began regularly purchasing and reselling certain products produced by Defendants which purportedly infringe on the '484 or '004 Patents as early as 2016 and have continued to do so even during the pendency of this suit. *See id.* at 4, 10. Although Plaintiffs accused Defendants of infringement on January 18, 2019, there were large gaps of time (*i.e.*, between 2016 and January 18, 2019, and again from October 2020 until the Complaint was filed on March 1, 2022) where the parties were not in communication with each other, leading Defendants to "reasonably conclude that Plaintiffs no longer considered the '484 Accused Products and the '004 Accused Products to infringe either the '484 Patent and the '004 Patent, and/or that Plaintiff had no intention of taking action against [Defendants] to preclude any further sales of the '484 Accused Products and the '004 Accused Products." *Id.* at 4–5. These allegations are sufficient, at this stage of the proceedings, to sustain the affirmative defenses.

The Federal Circuit has "described a typical equitable estoppel situation as one in which (1) the infringer knows of the patent, (2) the patentee objects to the infringer's activities, (3) but the patentee does not seek relief until much later, (4) thereby misleading the infringer to believe the patentee will not act." *Wang*, 103 F.3d at 1581 (citing *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1042–43 (Fed. Cir. 1992) (en banc), *abrogated on other grounds by SCA Hygiene Prods. Aktiebolag v. First Quality Baby Products, LLC*, 580 U.S. 328, 339 (2017)). Defendants allege this same prototypical scenario. Defendants have proffered that Plaintiffs knew

about the infringing products since at least 2016 (since they purchased and resold them) and did

not object until January 18, 2019.  Then, after a year-and-a-half of negotiations, Plaintiffs ceased

communicating with Defendants but did not file suit for another year-and-a-half.  *See* Resp. at 17–

18.  While silence alone is not enough to establish estoppel, Plaintiffs' multi-year silence followed

by an attempt to enforce their patents (which was then followed by even more silence) was

inconsistent conduct that could have reasonably mislead Defendants to believe—to their

detriment—that Plaintiffs would engage in further acts to protect their patents.  *See Aspex*

*Eyewear*, 605 F.3d at 1310 ("[R]eliance on Aspex's silence after its aggressive letters, represents

a significant change in economic position and constitutes material prejudice sufficient to support

equitable estoppel."); *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1557–58 (Fed. Cir. 1996)

(holding that a large gap in time between "mailing notice letters that threatened immediate

enforcement" and filing suit was sufficient basis for estoppel defense).

    Similarly, the Court finds that Plaintiffs' long periods of silence, combined with their

continuous conduct of purchasing and reselling Defendants' allegedly infringing products, is

sufficient to establish an implied waiver defense since Plaintiffs could have (but did not) asserted

their patent rights sooner and more vociferously.[10]  *See Qualcomm*, 548 F.3d at 1020–21.

    The implied license affirmative defense is a closer call, but the Court finds that Defendants

have alleged enough facts to support its application—at least in part.  Unlike estoppel and waiver,

an implied license requires proof that the patentee gave an "affirmative grant of consent" for the

alleged infringer to sell the patented product.  *See Wang*, 103 F.3d at 1581.  From 2016 until

---

[10]  Plaintiffs state that the "passage of time between the parties' last alleged communication and the filing
of the suit" is not long enough to establish waiver or estoppel and that, in any event, the delay can be
attributed to the COVID-19 pandemic.  Reply at 10–11.  These arguments might ultimately defeat these
affirmative defenses, but they are premature at this stage of proceedings.  *See, e.g.*, *Sprint Commc'ns Co.
L.P. v. Time Warner Cable, Inc.*, No. 11-2686, 2017 WL 978107, at *11 (D. Kan. Mar. 14, 2017) (finding,
after a bench trial, that there were other "reasonable explanations for Sprint's silence during that period
other than an intent to relinquish patent rights").

January 18, 2019, Plaintiffs did not accuse Defendants of infringing on their patents and instead "regularly purchas[ed] and res[old] certain of the '484 Accused Products and the '004 Accused Product[.]"  Second Am. Compl. at 10.  This is enough for Defendants to show that the "patentee acquiesced to the allegedly infringing activity for some time" by not disturbing the accused infringer's activities.  *Winbond Elecs.*, 262 F.3d at 1374; *see also, e.g.*, *Lautzenhiser Tech., LLC v. Sunrise Med. HHG, Inc.*, 752 F. Supp. 2d 988, 1013–14 (S.D. Ind. 2010) (citing *Mass Engineered Design v. Ergotron, Inc.*, 633 F. Supp. 2d 361, 386 (E.D. Tex. 2009)) (explaining that a patentee who sells an infringer's products may "create[ ] the affirmative grant required for an implied license").

However, even if an implied license did exist at one point, it undoubtedly ended when Plaintiffs accused Defendants of infringing on their patents on January 18, 2019.  Once the patentee takes affirmative steps to protect its patent, the infringer cannot reasonably believe that it has a license to use the patent thereafter—even if the patentee eventually abandons its attempt to enforce its patent rights. *See IMX, Inc. v. E-Loan, Inc.*, 748 F. Supp. 2d 1354, 1360 (S.D. Fla. 2010) ("Plaintiff's dismissal of a previous action for patent infringement against Defendant E–Loan and its intervening silence is not an affirmative grant of consent or permission.").  Although Plaintiffs' silence after accusing Defendants of infringement can still serve as the basis for an estoppel or waiver affirmative defense, there was no reasonable basis for Defendants to believe that Plaintiffs had given "an affirmative grant of consent or permission to make, use, or sell to the alleged infringer" after Defendants received the January 18, 2019 letter accusing them of infringement. *Winbond Elecs.*, 262 F.3d at 1374; *see also IMX*, 748 F. Supp. 2d at 1360 ("Defendant has alleged misleading conduct, which is enough for a defense of equitable estoppel but not for a defense based on an implied license.").

A district court should only grant a motion to strike in exceptional circumstances.  *See 1 Global Cap. LLC*, 331 F.R.D. at 437.  Since Defendants' Fourth, Fifth, and Twelfth Affirmative Defenses do not suffer from any fatal flaws, the Court will deny Plaintiffs' motion to strike these defenses.

<u>**CONCLUSION**</u>

Based on the foregoing, it is hereby **ORDERED AND ADJUDGED** that Plaintiffs' Motion to Dismiss Counterclaims and to Strike Defenses [ECF No. 115] is **GRANTED in part** and **DENIED in part** as follows:

1.  Counts V, VI, and XIV of AMC's Second Amended Counterclaims [ECF No. 97] are **DISMISSED with prejudice**.

2.  Count VII of AMC's Second Amended Counterclaims [ECF No. 97] is **DISMISSED without prejudice**.  AMC may file an amended pleading within **fourteen (14) days** of this Order.

3.  Plaintiffs' Motion to Strike Defendants' Fourth, Fifth, and Twelfth Affirmative Defenses is **DENIED**.

4.  Plaintiffs' Motion to Strike Defendants' Seventh and Eighth Affirmative Defenses is **GRANTED**.  Said defenses shall be **STRICKEN** from AMC's Second Amended Counterclaims [ECF No. 97], 3M's Answer to Second Amended Complaint [ECF No. 105], and LifeSync's Answer to Second Amended Complaint [ECF No. 106].

**DONE AND ORDERED** in Miami, Florida, this 27th day of August, 2023.

_____
**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**