# EXHIBIT 1

# SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into as of the date of the last signature set forth on the signature page below (the "Effective Date"), between KPR U.S., L.L.C. ("KPR"), a Delaware limited liability company located at 777 West Street, Mansfield, MA 02048 and Cardinal Health 200, LLC ("CAH"), a Delaware limited liability company located at 7000 Cardinal Place, Dublin, OH 43017, on the one hand, and LifeSync Corporation ("LifeSync"), a Delaware corporation located at 11705 NW 39th Street, Coral Springs, FL 33065, Advantage Medical Electronics LLC ("AMC"), a Delaware corporation located at 11705 NW 39th Street, Coral Springs, FL 33065, and 3M Company ("3M"), a Delaware corporation located at 3M Center, St. Paul, MN 55144, on the other hand. KPR, CAH, LifeSync, AMC and 3M are referred to in this Agreement collectively as the "Parties" and individually as a "Party."

## BACKGROUND

**A.** **WHEREAS** KPR owns, and CAH is the exclusive licensee of, the Kendall DL Patents (as defined in Section 1.1 below);

**B.** **WHEREAS** KPR and CAH allege that the manufacture, use, sale, offer for sale, or import by LifeSync, AMC and 3M of certain instrumentalities, in the absence of a license from KPR and CAH, infringes U.S. Patent Nos. 8,038,484, 8,795,004 and 9,107,594, under one or more of the provisions of 35 U.S.C. § 271, and filed claims and counterclaims against LifeSync, AMC and 3M in the United States District Court for the Southern District of Florida, Civil Action No. 0:22-cv-60468 for infringement of such patents ("the Lawsuit");

**C.** **WHEREAS** LifeSync, AMC and 3M have denied any infringement or liability of the asserted patents and AMC has filed counterclaims in such action seeking, *inter alia*, declaratory judgment that one or more claims of U.S. Patent Nos. 8,038,484, 8,795,004, 9,107,594, 8,152,571 and 8,690,611, under 28 U.S.C. §§ 2201 and 2202, is invalid, unenforceable and not infringed (collectively, the Lawsuit and all the claims and counterclaims asserted by the Parties in the Lawsuit are referred to in the Agreement as the "Litigation");

**D.** **WHEREAS** the Parties desire to resolve the Litigation without trial or adjudication of any issues of fact or law, and the Parties have agreed to settle, compromise, and resolve the Litigation on the terms and conditions set forth herein without this Agreement or its contents constituting any admission or evidence, or the basis for any finding or taking of judicial notice, of any wrongdoing or liability whatsoever, and without admitting infringement or liability and for settlement purposes, and in part to avoid the expense and risks associated with patent infringement litigation; and

**NOW, THEREFORE,** in consideration of the above promises and the mutual covenants of the Parties to be faithfully performed, each of the Parties, intending to be legally bound, agree as follows:

## 1. DEFINITIONS

In addition to the terms defined above and elsewhere in this Agreement, as used in this Agreement:

1.1 **"Kendall DL Patents"** means all patents and patent applications identified in Exhibit A and any patents or patent applications, divisionals, continuations, continuations in part, reexams, reissues, extensions, renewals. and the like, claiming priority to or having common priority with any of the patents or patent applications identified in Exhibit A.

1.2 **"Other Connector Patents"** means all patents other than Kendall DL Patents related to a lead wire for coupling to an ECG electrode patient side press stud owned or controlled by KPR, CAH or any of their Affiliates anywhere in the world which are currently issued or which issue in the future and claim priority to a current application. This expressly does not include any patents or patent applications owned or controlled by any successor, assign or acquirer before an event under Section 2.7.1 or 2.7.2.

1.3 **"Clips"** means ECG/EKG lead wires incorporating a connector.

1.4 **"New Product(s)"** means all Clips identified in Exhibit B (the "New Clips") and all Clips where the ECG/EKG press stud (i.e., patient side) connector is not colorably different from the ECG/EKG press stud (i.e., patient side) connector in the New Clips, so long as each such Clip is made by or for AMC or LifeSync, or any entity owned in whole or in part or controlled, directly or indirectly, by AMC or LifeSync.

1.5 **"Discontinued Products"** means all of the Clips identified in Exhibit C (the "Original Clips") and all Clips where the ECG/EKG press stud (i.e., patient side) connector is not colorably different from the ECG/EKG press stud (i.e., patient side) connector in the Original Clips.

1.6 **"Covered Countries"** means each country and jurisdiction including the United States with at least one active member of the Kendall DL Patents whose claims have not all been fully and finally invalidated or rendered unenforceable.

1.7 **"Covered Parties"** means LifeSync, AMC, and 3M and each of their current and future Affiliates and their permitted successors and assigns (Each of them individually is a Covered Party).

1.8 **"Affiliate(s)"** means, in relation to any Party hereto, any and all **"Person(s)"**, directly or indirectly, through one or more intermediates, owned or controlled by, owning or controlling or under common control or ownership with that Party.

1.9 **"Person"** or **"Persons"** means an individual, trust, corporation, partnership, joint venture, limited liability company, association, unincorporated organization or other legal or governmental entity or natural person.

**1.10** **"Reusable Discontinued Products"** means all Discontinued Products, which are intended for re-use without being reprocessed and resold.

**1.11** **"Disposable Discontinued Products"** means all Discontinued Products used by only one patient unless reprocessed and then resold.

**1.12** **"Authorized Third Party"** shall mean any Person that receives or has received from (to the extent allowed pursuant to Section 2 below) LifeSync, AMC and/or 3M or manufactures or has manufactured for LifeSync or AMC the New Products and the Discontinued Products authorized hereunder (collectively **"the Accused Products"**) or receives an Accused Product directly or indirectly from LifeSync, AMC or 3M, including, without limitation, direct and indirect suppliers, vendors, manufacturers, original equipment or device manufacturers, assemblers, distributors, resellers, customers, representatives, agents, subcontractors, or end-users.

**1.13** **"Permitted Transfer"** shall mean a sale or transfer of all or substantially all of the business or assets of a Party to which this Agreement pertains, either directly or by sale of stock, merger, consolidation, or other corporate transaction or transfer.

## 2. LICENSE AND COVENANT NOT TO SUE

**2.1** **Grant of License:** Subject to receipt of the first installment payment of the Settlement Payment in accordance with Section 4.1 below, KPR and CAH hereby grant:

**2.1.1** to LifeSync and AMC, a nonexclusive, nontransferable (except as set forth herein), perpetual, irrevocable, fully paid-up, royalty-free license under the Kendall DL Patents to make, have made, use, sell, offer for sale, import and otherwise dispose of the New Products in the Covered Countries and anywhere else in the world where they may have applicable rights, if any; and

**2.1.2** to 3M, a nonexclusive, nontransferable (except as set forth herein), perpetual, irrevocable, fully paid-up, royalty-free license under the Kendall DL Patents to use, sell, offer for sale, import and otherwise dispose of the New Products in the Covered Countries and anywhere else in the world where they may have applicable rights, if any, but only for New Products made by or supplied to 3M by AMC or LifeSync or their successors or assigns.

**2.2** **Grant of Covenant Not to Sue:** Subject to receipt of the first installment payment of the Settlement Payment in accordance with Section 4.1 below, CAH and KPR hereby irrevocably covenant that neither CAH nor KPR, nor any of their Affiliates, successors or assigns shall, directly or indirectly, cause, induce, or authorize the commencement, maintenance, or prosecution of any action or proceeding of any kind including, but not limited to, any suit, complaint, demand, claim or cause of

action against LifeSync, AMC, 3M, their Affiliates or their Authorized Third Parties for patent infringement of any claim of the Kendall DL Patents based upon the manufacture, use, sale, offer for sale, importation, distribution or otherwise disposal of any of the New Products.

**2.3**   **Grant of Covenant Not to Sue:** Subject to receipt of the first installment payment of the Settlement Payment in accordance with Section 4.1 below, CAH and KPR also hereby irrevocably covenant that neither CAH nor KPR, nor any of their Affiliates, successors or assigns shall, directly or indirectly, cause, induce, or authorize the commencement, maintenance, or prosecution of any action or proceeding of any kind including, but not limited to, any suit, complaint, demand, claim or cause of action against LifeSync, AMC, 3M, their Affiliates or their Authorized Third Parties for patent infringement of any claim of the Other Connector Patents based upon the manufacture, use, sale, offer for sale, importation, distribution or otherwise disposal of any of the New Products so long as no part of the lead wires or connectors of the New Products is colorably different from any part of the lead wires or connectors of the New Clips sold on or before August 1, 2023; provided that any claim for patent infringement of one of the Other Connector Patents hereunder is arising at least in part to one of the changes that is colorably different.

due

**2.4**   **Term of the Limited License and the Covenant Not to Sue:** The term of the license and the covenant not to sue runs from August 1, 2023 through July 12, 2035 or six years after the expiration of the last patent of the Kendall DL Patents, whichever is later; provided, however, to the extent that the second installment payment is not paid in accordance with Section 4.1 below, the license and covenant not to sue are hereby revoked.

INITIALS

**2.5**   For clarity, the license and covenant not to sue do not cover at least the following (this list is nonlimiting): (i) Discontinued Products that are manufactured, used, sold or offered for sale by AMC or LifeSync in violation of Sections 6.1 and 6.2; (ii) any Clip not made by or for LifeSync or AMC, or any of their Affiliates; (iii) 3M products that are not New Products; and (iv) any Clip that is not a New Product.

**2.6**   **No Challenges:** LifeSync, AMC and 3M, and each of their present and future Affiliates, shall not maintain, challenge, encourage others to challenge or assist others in challenging in any way, the validity or enforceability of any claim of any of the Kendall DL Patents, Other Connector Patents and Other Patents, except that each of LifeSync, AMC and 3M, and each of their present and future Affiliates shall have the right to challenge the validity and enforceability of any such claim of a Kendall DL Patent, Other Connector Patent or Other Patents in defense of a patent infringement lawsuit, and to assert any other defense or allegation concerning any Kendall DL Patent, Other Connector Patent or Other Patents in any such lawsuit, including without limitation asserting a defense or allegation that any Kendall DL Patent, Other Connector Patent or Other Patents is not infringed. Any such challenge shall be limited to the Kendall DL Patents, Other Connector Patents or Other Patents sued upon.

action against LifeSync, AMC, 3M, their Affiliates or their Authorized Third Parties for patent infringement of any claim of the Kendall DL Patents based upon the manufacture, use, sale, offer for sale, importation, distribution or otherwise disposal of any of the New Products.

2.3   **Grant of Covenant Not to Sue:** Subject to receipt of the first installment payment of the Settlement Payment in accordance with Section 4.1 below, CAH and KPR also hereby irrevocably covenant that neither CAH nor KPR, nor any of their Affiliates, successors or assigns shall, directly or indirectly, cause, induce, or authorize the commencement, maintenance, or prosecution of any action or proceeding of any kind including, but not limited to, any suit, complaint, demand, claim or cause of action against LifeSync, AMC, 3M, their Affiliates or their Authorized Third Parties for patent infringement of any claim of the Other Connector Patents based upon the manufacture, use, sale, offer for sale, importation, distribution or otherwise disposal of any of the New Products so long as no part of the lead wires or connectors of the New Products is colorably different from any part of the lead wires or connectors of the New Clips sold on or before August 1, 2023; provided that any claim for patent infringement of one of the Other Connector Patents hereunder is arising at least in part to one of the changes that is colorably different.

due

2.4   **Term of the Limited License and the Covenant Not to Sue:** The term of the license and the covenant not to sue runs from August 1, 2023 through July 12, 2035 or six years after the expiration of the last patent of the Kendall DL Patents, whichever is later; provided, however, to the extent that the second installment payment is not paid in accordance with Section 4.1 below, the license and covenant not to sue are hereby revoked.

*fsb*

INITIALS

2.5   For clarity, the license and covenant not to sue do not cover at least the following (this list is nonlimiting): (i) Discontinued Products that are manufactured, used, sold or offered for sale by AMC or LifeSync in violation of Sections 6.1 and 6.2; (ii) any Clip not made by or for LifeSync or AMC, or any of their Affiliates; (iii) 3M products that are not New Products; and (iv) any Clip that is not a New Product.

2.6   **No Challenges:** LifeSync, AMC and 3M, and each of their present and future Affiliates, shall not maintain, challenge, encourage others to challenge or assist others in challenging in any way, the validity or enforceability of any claim of any of the Kendall DL Patents, Other Connector Patents and Other Patents, except that each of LifeSync, AMC and 3M, and each of their present and future Affiliates shall have the right to challenge the validity and enforceability of any such claim of a Kendall DL Patent, Other Connector Patent or Other Patents in defense of a patent infringement lawsuit, and to assert any other defense or allegation concerning any Kendall DL Patent, Other Connector Patent or Other Patents in any such lawsuit, including without limitation asserting a defense or allegation that any Kendall DL Patent, Other Connector Patent or Other Patents is not infringed. Any such challenge shall be limited to the Kendall DL Patents, Other Connector Patents or Other Patents sued upon.

action against LifeSync, AMC, 3M, their Affiliates or their Authorized Third Parties for patent infringement of any claim of the Kendall DL Patents based upon the manufacture, use, sale, offer for sale, importation, distribution or otherwise disposal of any of the New Products.

**2.3**   **Grant of Covenant Not to Sue:** Subject to receipt of the first installment payment of the Settlement Payment in accordance with Section 4.1 below, CAH and KPR also hereby irrevocably covenant that neither CAH nor KPR, nor any of their Affiliates, successors or assigns shall, directly or indirectly, cause, induce, or authorize the commencement, maintenance, or prosecution of any action or proceeding of any kind including, but not limited to, any suit, complaint, demand, claim or cause of action against LifeSync, AMC, 3M, their Affiliates or their Authorized Third Parties for patent infringement of any claim of the Other Connector Patents based upon the manufacture, use, sale, offer for sale, importation, distribution or otherwise disposal of any of the New Products so long as no part of the lead wires or connectors of the New Products is colorably different from any part of the lead wires or connectors of the New Clips sold on or before August 1, 2023; provided that any claim for patent infringement of one of the Other Connector Patents hereunder is arising at least in part to one of the changes that is colorably different.

*due*

**2.4**   **Term of the Limited License and the Covenant Not to Sue:** The term of the license and the covenant not to sue runs from August 1, 2023 through July 12, 2035 or six years after the expiration of the last patent of the Kendall DL Patents, whichever is later; provided, however, to the extent that the second installment payment is not paid in accordance with Section 4.1 below, the license and covenant not to sue are hereby revoked.

*MVA*

INITIALS

**2.5**   For clarity, the license and covenant not to sue do not cover at least the following (this list is nonlimiting): (i) Discontinued Products that are manufactured, used, sold or offered for sale by AMC or LifeSync in violation of Sections 6.1 and 6.2; (ii) any Clip not made by or for LifeSync or AMC, or any of their Affiliates; (iii) 3M products that are not New Products; and (iv) any Clip that is not a New Product.

**2.6**   **No Challenges:** LifeSync, AMC and 3M, and each of their present and future Affiliates, shall not maintain, challenge, encourage others to challenge or assist others in challenging in any way, the validity or enforceability of any claim of any of the Kendall DL Patents, Other Connector Patents and Other Patents, except that each of LifeSync, AMC and 3M, and each of their present and future Affiliates shall have the right to challenge the validity and enforceability of any such claim of a Kendall DL Patent, Other Connector Patent or Other Patents in defense of a patent infringement lawsuit, and to assert any other defense or allegation concerning any Kendall DL Patent, Other Connector Patent or Other Patents in any such lawsuit, including without limitation asserting a defense or allegation that any Kendall DL Patent, Other Connector Patent or Other Patents is not infringed. Any such challenge shall be limited to the Kendall DL Patents, Other Connector Patents or Other Patents sued upon.

**2.7    Marking:**

**2.7.1** Within six (6) months after the Effective Date, the New Products made, used, sold or offered for sale in the United States or imported into the United States shall be virtually marked by LifeSync, AMC and 3M, and each of their current and future Affiliates (the "Marking Entities"), with United States Patent Nos. 8,795,004 and 9,107,594 in compliance with the virtual marking requirements set forth in 35 U.S.C. § 287 and judicial authority governing same. To the extent that any New Product sold by 3M, or its current and future Affiliates, already contains marking in compliance with this provision from one of the other Marking Entities, the marking obligation is satisfied for that product.

**2.7.2** CAH and KPR and their Affiliates will not market or use the fact for sales purposes that the New Products are licensed, infringed or are being marked by the Marking Entities with the '004 and '594 patents. It will not be a material breach of this Agreement if any of the Marking Entities inadvertently fails to mark a New Product. Any inadvertent failure to mark under this section shall be cured within twenty business (20) days of receiving notice of the inadvertent failure to mark. For clarity, any cure of an inadvertent failure to mark under this section will entail marking the New Products on a going forward basis and will not require a recall.

**2.7.3** The Parties acknowledge and agree that it will not be a material breach of this Agreement if less than 10% of the New Products are not marked.

**2.8    Assignability/Transferability:** None of the Parties may grant or assign any rights or delegate any duties under this Agreement to any third party without the prior written consent of the unrelated Parties, except as follows:

**2.8.1** Each of CAH and KPR may assign or otherwise transfer all or any of its respective rights, or delegate or otherwise transfer all or any of its respective obligations or performance, under this Agreement without notice to or consent of LifeSync, AMC or 3M. The covenant not to sue, release and license obligations in this Agreement shall pass to the merged entity, purchaser or acquirer. CAH and KPR agree to notify the successor of interests of all obligations under this Agreement and require the successor in interest to be bound by such obligations. Additionally, CAH and KPR shall remain bound by their respective covenants and obligations contained herein.

**2.8.2** In the event that any part or all of the Kendall DL Patents, or any right in, to, or under the Kendall DL Patents, is sold, assigned or transferred, the Person receiving such right, title, or interest in or to any of the Kendall DL Patents shall be notified by CAH and KPR of all obligations under this Agreement and expressly assume and agree to be bound by the covenant not to sue, the license obligations, and any other obligations to which CAH and KPR would otherwise remain bound, set forth in this Agreement.

**2.8.3** Each of LifeSync, AMC and 3M may assign or otherwise transfer all or any of its respective rights, or delegate or otherwise transfer all or any of its respective obligations or performance, under this Agreement without notice or consent of CAH or KPR, in conjunction with a Permitted Transfer. For clarity, 3M Company's spin-off of its health care business is a Permitted Transfer. Without limiting the foregoing, in the event of the occurrence of a Permitted Transfer, the obligations, covenant not to sue, release and license rights granted under this Agreement shall pass to the merged entity, purchaser or acquirer, and shall continue and remain with the assigned or transferred business of LifeSync, AMC or 3M, as applicable, at the time of the merger, spin-off, sale or acquisition, but shall not extend to any other extant products of any entity that is merged with LifeSync, AMC or 3M or that purchases or acquires LifeSync, AMC or 3M. Lifesync, AMC and 3M agree to notify their assigns or successor of interests of all obligations under this Agreement and require the successor in interest to be bound by such obligations.

**2.9** **Patent Challenges**. LifeSync, AMC and 3M, and each of their Affiliates shall withdraw any and all existing validity, patentability or unenforceability challenges to any and all claims of any and all of the Kendall DL Patents as of the date of the dismissal of the Litigation.

**2.10** **Other Patents**. CAH, KPR and their Affiliates, Successors and Assigns agree not to assert any patent rights currently owned or controlled by CAH, KPR and their Affiliates ("Other Patents") against LifeSync, AMC, 3M, their Affiliates or their Authorized Third Parties based upon the manufacture, use, sale, offer for sale, importation, distribution or otherwise disposal of any of the New Products so long as no part of the lead wires and connectors of the New Products is colorably different from any part of the lead wires and connectors of the New Clips sold on or before August 1, 2023; provided that any assertion of patent infringement of one of the Other Patents is arising at least in part to one of the changes that is colorably different.

due

**2. RELEASES AND DISMISSAL OF LITIGATION**

INITIALS

**3.1** **Releases by KPR and CAH:**

**3.1.1** Subject to the payment of the first installment payment of the Settlement Payment in accordance with Section 4.1 below, KPR and CAH, on behalf of themselves, their predecessors, successors, Affiliates, assigns and all Persons acting by, through, under, or in concert with them, release and discharge each of AMC and LifeSync and their respective shareholders, members, predecessors, successors, assigns, Affiliates, directors, officers, employees, insurers, attorneys, Authorized Third Parties, suppliers, customers and end users from any and all claims, charges, complaints, counterclaims, demands, liability, obligations, actions and causes of action,

**2.8.3** Each of LifeSync, AMC and 3M may assign or otherwise transfer all or any of its respective rights, or delegate or otherwise transfer all or any of its respective obligations or performance, under this Agreement without notice or consent of CAH or KPR, in conjunction with a Permitted Transfer. For clarity, 3M Company's spin-off of its health care business is a Permitted Transfer. Without limiting the foregoing, in the event of the occurrence of a Permitted Transfer, the obligations, covenant not to sue, release and license rights granted under this Agreement shall pass to the merged entity, purchaser or acquirer, and shall continue and remain with the assigned or transferred business of LifeSync, AMC or 3M, as applicable, at the time of the merger, spin-off, sale or acquisition, but shall not extend to any other extant products of any entity that is merged with LifeSync, AMC or 3M or that purchases or acquires LifeSync, AMC or 3M. Lifesync, AMC and 3M agree to notify their assigns or successor of interests of all obligations under this Agreement and require the successor in interest to be bound by such obligations.

**2.9** **Patent Challenges**. LifeSync, AMC and 3M, and each of their Affiliates shall withdraw any and all existing validity, patentability or unenforceability challenges to any and all claims of any and all of the Kendall DL Patents as of the date of the dismissal of the Litigation.

**2.10** **Other Patents**. CAH, KPR and their Affiliates, Successors and Assigns agree not to assert any patent rights currently owned or controlled by CAH, KPR and their Affiliates ("Other Patents") against LifeSync, AMC, 3M, their Affiliates or their Authorized Third Parties based upon the manufacture, use, sale, offer for sale, importation, distribution or otherwise disposal of any of the New Products so long as no part of the lead wires and connectors of the New Products is colorably different from any part of the lead wires and connectors of the New Clips sold on or before August 1, 2023; provided that any assertion of patent infringement of one of the Other Patents is arising at least in part to one of the changes that is colorably different.

due ⟶

**2. RELEASES AND DISMISSAL OF LITIGATION**

**3.1** **Releases by KPR and CAH:**

**3.1.1** Subject to the payment of the first installment payment of the Settlement Payment in accordance with Section 4.1 below, KPR and CAH, on behalf of themselves, their predecessors, successors, Affiliates, assigns and all Persons acting by, through, under, or in concert with them, release and discharge each of AMC and LifeSync and their respective shareholders, members, predecessors, successors, assigns, Affiliates, directors, officers, employees, insurers, attorneys, Authorized Third Parties, suppliers, customers and end users from any and all claims, charges, complaints, counterclaims, demands, liability, obligations, actions and causes of action,

INITIALS

**2.8.3** Each of LifeSync, AMC and 3M may assign or otherwise transfer all or any of its respective rights, or delegate or otherwise transfer all or any of its respective obligations or performance, under this Agreement without notice or consent of CAH or KPR, in conjunction with a Permitted Transfer. For clarity, 3M Company's spin-off of its health care business is a Permitted Transfer. Without limiting the foregoing, in the event of the occurrence of a Permitted Transfer, the obligations, covenant not to sue, release and license rights granted under this Agreement shall pass to the merged entity, purchaser or acquirer, and shall continue and remain with the assigned or transferred business of LifeSync, AMC or 3M, as applicable, at the time of the merger, spin-off, sale or acquisition, but shall not extend to any other extant products of any entity that is merged with LifeSync, AMC or 3M or that purchases or acquires LifeSync, AMC or 3M. Lifesync, AMC and 3M agree to notify their assigns or successor of interests of all obligations under this Agreement and require the successor in interest to be bound by such obligations.

**2.9**   **Patent Challenges**. LifeSync, AMC and 3M, and each of their Affiliates shall withdraw any and all existing validity, patentability or unenforceability challenges to any and all claims of any and all of the Kendall DL Patents as of the date of the dismissal of the Litigation.

**2.10**  **Other Patents**. CAH, KPR and their Affiliates, Successors and Assigns agree not to assert any patent rights currently owned or controlled by CAH, KPR and their Affiliates ("Other Patents") against LifeSync, AMC, 3M, their Affiliates or their Authorized Third Parties based upon the manufacture, use, sale, offer for sale, importation, distribution or otherwise disposal of any of the New Products so long as no part of the lead wires and connectors of the New Products is colorably different from any part of the lead wires and connectors of the New Clips sold on or before August 1, 2023; provided that any assertion of patent infringement of one of the Other Patents is arising at least in part to one of the changes that is colorably different. ↑

due ———————————————————————

## 2. RELEASES AND DISMISSAL OF LITIGATION



INITIALS

**3.1**   **Releases by KPR and CAH:**

**3.1.1**  Subject to the payment of the first installment payment of the Settlement Payment in accordance with Section 4.1 below, KPR and CAH, on behalf of themselves, their predecessors, successors, Affiliates, assigns and all Persons acting by, through, under, or in concert with them, release and discharge each of AMC and LifeSync and their respective shareholders, members, predecessors, successors, assigns, Affiliates, directors, officers, employees, insurers, attorneys, Authorized Third Parties, suppliers, customers and end users from any and all claims, charges, complaints, counterclaims, demands, liability, obligations, actions and causes of action,

suits, damages, costs, expenses and attorneys' fees of any kind or description whatsoever, known or unknown, in law or in equity, arising from or related to the claims and counterclaims raised or which could have been raised in the Litigation and any associated administrative proceedings based on the manufacture, sale, offer for sale, use, importation or other disposal of the Original Clips and the New Clips through the Effective Date; and

3.1.2   Subject to full receipt of the first installment payment of the Settlement Payment in accordance with Section 4.1 below, KPR and CAH on behalf of themselves, their predecessors, successors, Affiliates, assigns and all Persons acting by, through, under, or in concert with them, release and discharge each of 3M and their respective shareholders, members, predecessors, successors, assigns, Affiliates, directors, officers, employees, insurers, attorneys, Authorized Third Parties, suppliers, customers and end users from any and all claims, charges, complaints, counterclaims, demands, liability, obligations, actions and causes of action, suits, damages, costs, expenses and attorneys' fees of any kind or description whatsoever, known or unknown, in law or in equity, arising from or related to the claims and counterclaims raised or which could have been raised in the Litigation and any associated administrative proceedings based on the use, sale, offer for sale or other disposal of the Original Clips and the New Clips through the Effective Date.

For the avoidance of doubt, the releases granted in this Section 3.1 do not apply to any claims that might hereafter arise out of the performance or breach of this Agreement.  Further, to the extent that the second installment payment is not paid in accordance with Section 4.1 below, the releases granted under Section 3.1 are hereby revoked.

3.2   **Release by AMC, LifeSync and 3M:** AMC, LifeSync and 3M, on behalf of themselves, their predecessors, successors, Affiliates, assigns and all Persons acting by, through, under, or in concert with them, release and discharge each of KPR and CAH and their respective shareholders, predecessors, successors, assigns, Affiliates, directors, officers, employees, insurers, attorneys, suppliers, customers and end users from any and all claims, charges, complaints, counterclaims, demands, liability, obligations, actions and causes of action, suits, damages, costs, expenses and attorneys' fees of any kind or description whatsoever, known or unknown, in law or in equity, arising from or related to the claims and counterclaims raised or which could have been raised in the Litigation and any associated administrative proceedings through the Effective Date.

For the avoidance of doubt, the releases granted in this Section 3.2 do not apply to any claims that might hereafter arise out of the performance or breach of this Agreement.  Further, to the extent that the releases under Section 3.1 are revoked, the releases granted under Section 3.2 are hereby revoked.

**3.3**   **Unknown Claims:** The Parties expressly acknowledge and agree that this Agreement fully and finally releases and forever resolves the claims and counterclaims in the Litigation, including those claims and counterclaims that are unknown, unanticipated, or unsuspected, or that may hereafter arise as a result of the discovery of new and/or additional facts. The Parties acknowledge and understand the significance and potential consequences of their release of unknown claims. The Parties agree to waive and relinquish all rights and benefits each may have under Section 1542 of the Civil Code of the State of California, or any similar statute or law of any other jurisdiction. Section 1542 reads as follows: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

**3.4**   **Dismissal of Litigation:** Subject to and within ten (10) business days of CAH's full receipt of the first installment payment of the Settlement Payment in accordance with Section 4.1 below, the Parties shall file a joint stipulation of dismissal pursuant to Fed.R.Civ.P. 41, dismissing all claims, counterclaims and defenses in the Litigation with prejudice, with each Party to bear its respective attorneys' fees, costs and expenses related to the Litigation (the "**Stipulation**"). The Stipulation shall request that the Court retain jurisdiction for the sole purpose of enforcing this Agreement, but shall state that the dismissal shall be effective and with prejudice regardless of whether the Court grants such request. In the event that the Court requires that this Agreement be filed with the Court pursuant to granting such request, the Parties shall further request that this Agreement be filed under seal. In the event that such further request is denied, the Parties shall additionally request that the Settlement Fee be allowed to be redacted from this Agreement as-filed.

**4.**   **PAYMENT**

**4.1**   **Settlement Payment:** AMC and LifeSync, and each of their successors and assigns, shall pay CAH the total of ███████ United States Dollars (U.S. $███████ (the "Settlement Payment") in two installment payments as follows:

    **4.1.1**   First Installment Payment to be made on or before five days of the exchange of a fully signed Agreement, in the amount of ████████████ (U.S. $███████ and

    **4.1.2**   Second Installment Payment to be made on or before June 28, 2024, in the amount of ██████████ (U.S. $███████

**4.2**   Each Party is responsible for accurately reporting the tax consequences of the making and performance of this Agreement. The Parties further acknowledge and

agree: (i) that no representations have been made by any other Party regarding the appropriate tax treatment of any financial benefits or detriments resulting from the making or performance of this Agreement, and (ii) that no Party shall have any claim against any other Party based on or arising from any inaccurate reporting of the tax consequences of the making or performance of this Agreement.

4.3    The parties acknowledge that the Settlement Payment was agreed upon as compromise and final settlement of disputed claims and that payment of the Settlement Payment is not, and may not be construed as, an admission of liability by AMC, LifeSync or 3M and is not to be construed as an admission that AMC, LifeSync or 3M engaged in any infringement, or any wrongful, tortious or unlawful activity.

## 5.    KENDALL COMPATIBLE RESTRICTION

5.1    LifeSync, AMC and 3M, and each of their Affiliates further agree that each of them shall not use the term "Kendall Compatible" or represent that any of their Clips are compatible with Kendall, Covidien, Cardinal Health or Kendall DL®-branded products, on product packaging for Clips or in any advertisement for the sale of Clips. It will not be a material breach of this Agreement if any Party inadvertently violates this section. Any inadvertent violation of this section shall be cured on a going forward basis within twenty business (20) days of receiving notice of the inadvertent violation. Nothing in this Section shall be deemed to preclude AMC, LifeSync or 3M, or any of their Affiliates, from engaging in advertising or promotional efforts that compare their or another's products to Kendall, Covidien, Cardinal Health or Kendall DL®-branded products.

## 6.    DISCONTINUED PRODUCTS

6.1    Each of the Covered Parties shall not manufacture, use, transfer, sell or offer for sale in, or import for sale into, any of the Covered Countries any Disposable Discontinued Products during the period from January 1, 2024 through July 12, 2029.

6.2    Each of the Covered Parties shall not manufacture, use, transfer, sell, offer for sale in, or import for sale into, any of the Covered Countries any Reusable Discontinued Products during the period from October 1, 2024 through July 12, 2029.

6.3    **Wind Down Sales:** Subject to the receipt of the first installment payment in accordance with Section 4.1.1, CAH and KPR agree to allow the Covered Parties to wind down the sales of the disposable Discontinued Products from August 1, 2023 through December 31, 2023, and wind down the sales of the reusable Discontinued Products from August 1, 2023 through September 30, 2024 (collectively the "Wind Down Periods"). CAH, KPR and their Affiliates, successors and assigns agree not to assert any of the Kendall DL Patents or the Other Connector Patents against any Discontinued Products sold during the Wind Down Periods, including 3M's additional period set forth in Section 6.4. During

the Wind Down Periods, the monthly number of units sold or transferred by each of the Covered Parties for each of the Discontinued Products shall not be higher than the average monthly number of units sold or transferred of the Discontinued Products by the Covered Parties during the previous twelve-month period (July 31, 2022 through July 31, 2023). Any inadvertent de minimis sales by the Covered Parties after the Wind Down Periods will not be considered a breach of this Section 6.3.

6.4     Subject to the Covered Parties' material compliance with Section 6.3, and notwithstanding the prohibitions in Sections 6.1-6.2, the Parties agree that 3M and its Affiliates can still sell the Disposable Discontinued Products and the Reusable Discontinued Products, each for a four-month period immediately following the end of the respective Wind Down Periods in 6.3.

6.5     Subject to the Covered Parties' material compliance with Section 6.3, any Person, other than 3M and its Affiliates, that receives or has received from LifeSync, AMC and/or 3M Disposable Discontinued Products and Reusable Discontinued Products from Covered Parties before and during the Wind Down Periods, may sell all such products at any point during and after the Wind Down Periods.

6.6     **Independent Third-Party Audits:** Once during the period from January 1, 2024 through July 12, 2029, CAH and KPR shall have the right to have an independent third-party audit the compliance of AMC and LifeSync with the terms of Sections 6.1 – 6.4. At CAH or KPR's request, AMC and LifeSync shall give the independent third-party auditor access to their accounting and other records reasonably necessary to carry out the audit. AMC and LifeSync shall fully cooperate with such audit and provide the third-party auditor with access to such accounting and other records within 30 calendar days of receiving the request from CAH or KPR. CAH and KPR will bear the costs of such audits unless the independent third-party audit finds that one or more of AMC and LifeSync has materially violated any of the terms of Sections 6.1 – 6.4 (the entity in violation shall then pay the reasonable costs of the audit). In the event that one of AMC and LifeSync is found by the audit to have materially violated any of the terms of Sections 6.1 – 6.4, CAH and KPR shall have the right to have a second independent third-party audit of the entity in violation prior to July 12, 2029 to check compliance with the terms of Sections 6.1 – 6.4.

7.     **TERM AND TERMINATION**

7.1     **Termination for Breach:** CAH and KPR may terminate this Agreement upon twenty (20) business days written notice to AMC and LifeSync if either of the payment installments contained in Section 4.1 above are not met, provided that AMC and LifeSync have not cured the breach within such twenty (20) business day period.

7.2     **No Refund:** In no event, including in the event of a finding of invalidity or unenforceability of one or more claims of any or all of the Kendall DL Patent(s),

or termination of the Agreement based on the failure to pay the second installment payment under Section 4.1, shall AMC or LifeSync be entitled to a refund or reimbursement of any portion of the Settlement Payment paid.

7.3     **Survival**: Sections 1, 4, 5, 6, 7, 8 and 9 of this Agreement shall survive the termination of this Agreement pursuant to Section 7.1 above. If all payments are made under Section 4.1, all provisions of this Agreement shall survive the Agreement's expiration, to the extent they have not been fully performed at the end of the Term.

7.4     **Breach by One Party**: With the exception of the payment provisions in Section 4.1, any breach by a Party of any of the terms or conditions of this Agreement shall not constitute a breach of this Agreement by any other Party.

8.     **NOTICE**

8.1     All notices required or permitted under this Agreement shall be given in writing and shall be sent via e-mail as well as overnight carrier to the following:

**If to CAH and KPR:**

Cardinal Health – Legal Department
7000 Cardinal Place, Dublin OH 43017

**And copy to:**

BakerHostetler LLP
Attn: Kevin W. Kirsch, Esq. and Cardinal Health Relationship Partner
200 Civic Center Dr., Suite 1200
Columbus, OH 43215-4138

**If to LifeSync, AMC and 3M:**

Robert Buehler
Chief Executive Officer
LifeSync Corporation
11705 NW 39th Street
Coral Springs, Florida 33065

Robert Buehler
Chief Executive Officer
Advantage Medical Electronics LLC
11705 NW 39th Street
Coral Springs, Florida 33065

Office of Intellectual Property Counsel
3M Innovative Properties Company

3M Center, Mail Stop 220-9E-01
2501 Hudson Road
St. Paul, MN 55144-1000
United States of America
Attn: Chief Intellectual Property Counsel

Office of Intellectual Property Counsel
3M Healthcare IPC.
c/o 3M Company
3M Center, Mail Stop 220-9E-01
2501 Hudson Road
St. Paul, MN 55144-1000
United States of America
Attn: Chief Intellectual Property Counsel

**And copy to:**

Patzik, Frank & Samotny Ltd.
Attn: Jeffrey A. Pine, Esq.
200 South Wacker Drive, Suite 2700
Chicago, Illinois 60606

9.   **MISCELLANEOUS**

9.1   **Non-Agency:** Nothing in this Agreement is intended or shall be deemed to constitute a partnership, agency, employer-employee, or joint venture relationship between any of the Parties.

9.2   **Confidentiality:** Each of the Parties (i) shall protect the Confidential Information (as described below) of this Agreement with at least the same degree of care used to protect its own confidential information and (ii) shall not use (except for the purpose described in this Agreement), publish or disclose to third parties such Confidential Information.

   9.2.1   "Confidential Information" includes (a) the specific terms of this Agreement, except that "Confidential Information" excludes information that is: (1) developed independently and without access to this Agreement; (2) publicly available other than through the fault of the receiving party; (3) released without restriction by the disclosing party to another without obligation of confidentiality; or (4) known to the receiving party prior to its disclosure, to the extent such prior knowledge can be corroborated by written records, provided, however, that Protected Health Information and any regulated personally identifiable information shall always constitute Confidential Information.

   9.2.2   If disclosure of any Confidential Information is required by law, the Party being required to disclose the other Party's information shall promptly notify

such other Party in writing and take appropriate action to safeguard the confidentiality of such information including, at the other Party's expense, seeking a protective order from a court of competent jurisdiction.

9.2.3   Any Party may disclose the Confidential Information to its legal advisors, accountants, third party contractors, business consultants, and actual and prospective investors, shareholds, and purchasers who are obligated to maintain confidentiality of the Confidential Information and whose services for such party require access to the Confidential Information.

*shareholders*

INITIALS

**9.3    Entire Agreement, Amendments, and Waivers:** This Agreement constitutes and contains the entire agreement between the Parties, and supersedes any and all prior negotiations, conversations, correspondence, understandings, term sheets and letters respecting the subject matter hereof. This Agreement may be amended or modified or one or more provisions hereof waived only by a written instrument signed by all of the Parties. No delay or omission by any Party in exercising any right or power arising from any default by the other Party shall be construed as a waiver of such default, nor shall any single or partial exercise thereof preclude any further exercise thereof or the exercise of any other right or power arising from any default by a Party. No waiver of any breach of any covenant or other condition shall be construed to be a waiver of or consent to any previous or subsequent breach of the same or of any other covenant or condition.

**9.4    Severability and Captions:** If any term, clause or provision of this Agreement shall be determined by a court of competent jurisdiction to be invalid or unenforceable, the validity and enforceability of any other term, clause or provision shall not be thereby affected, and such invalid or unenforceable term, clause or provision shall be modified by a court in a manner that would make it valid and enforceable and would accomplish the intention of the Parties to the fullest extent lawfully possible. The captions to this Agreement are for convenience only and are to be of no force or effect in construing and interpreting the provisions of this Agreement.

**9.5    Construction of Ambiguity:** Each of the Parties participated in the drafting of this Agreement and any ambiguity found herein shall not be construed against any Party. The language of this Agreement shall be construed as a whole, according to its fair meaning and intent, and not strictly for or against any Party, regardless of who drafted or was principally responsible for drafting the Agreement or any specific term or provision hereof.

**9.6    Authorized Parties:** Each Party represents and warrants that it has the full power and authority to enter into this Agreement and to perform all actions and obligations set forth herein or required hereunder. Each signatory to this Agreement who signs on behalf of a Party represents and warrants that he or she has the authority to sign on behalf of that Party.

**9.7    Ownership of Released Claims:** Each Party hereby warrants and represents that it owns one hundred percent (100%) of all of the claims and counterclaims it is releasing

such other Party in writing and take appropriate action to safeguard the confidentiality of such information including, at the other Party's expense, seeking a protective order from a court of competent jurisdiction.

9.2.3   Any Party may disclose the Confidential Information to its legal advisors, accountants, third party contractors, business consultants, and actual and prospective investors, shareholders and purchasers who are obligated to maintain confidentiality of the Confidential Information and whose services for such party require access to the Confidential Information.

shareholders

INITIALS

9.3   **Entire Agreement, Amendments, and Waivers:** This Agreement constitutes and contains the entire agreement between the Parties, and supersedes any and all prior negotiations, conversations, correspondence, understandings, term sheets and letters respecting the subject matter hereof. This Agreement may be amended or modified or one or more provisions hereof waived only by a written instrument signed by all of the Parties. No delay or omission by any Party in exercising any right or power arising from any default by the other Party shall be construed as a waiver of such default, nor shall any single or partial exercise thereof preclude any further exercise thereof or the exercise of any other right or power arising from any default by a Party. No waiver of any breach of any covenant or other condition shall be construed to be a waiver of or consent to any previous or subsequent breach of the same or of any other covenant or condition.

9.4   **Severability and Captions:** If any term, clause or provision of this Agreement shall be determined by a court of competent jurisdiction to be invalid or unenforceable, the validity and enforceability of any other term, clause or provision shall not be thereby affected, and such invalid or unenforceable term, clause or provision shall be modified by a court in a manner that would make it valid and enforceable and would accomplish the intention of the Parties to the fullest extent lawfully possible. The captions to this Agreement are for convenience only and are to be of no force or effect in construing and interpreting the provisions of this Agreement.

9.5   **Construction of Ambiguity:** Each of the Parties participated in the drafting of this Agreement and any ambiguity found herein shall not be construed against any Party. The language of this Agreement shall be construed as a whole, according to its fair meaning and intent, and not strictly for or against any Party, regardless of who drafted or was principally responsible for drafting the Agreement or any specific term or provision hereof.

9.6   **Authorized Parties:** Each Party represents and warrants that it has the full power and authority to enter into this Agreement and to perform all actions and obligations set forth herein or required hereunder. Each signatory to this Agreement who signs on behalf of a Party represents and warrants that he or she has the authority to sign on behalf of that Party.

9.7   **Ownership of Released Claims:** Each Party hereby warrants and represents that it owns one hundred percent (100%) of all of the claims and counterclaims it is releasing

such other Party in writing and take appropriate action to safeguard the confidentiality of such information including, at the other Party's expense, seeking a protective order from a court of competent jurisdiction.

shareholders ————

**9.2.3**   Any Party may disclose the Confidential Information to its legal advisors, accountants, third party contractors, business consultants, and actual and prospective investors, ~~shareholds~~ and purchasers who are obligated to maintain confidentiality of the Confidential Information and whose services for such party require access to the Confidential Information.

MVA

INITIALS

**9.3**   **Entire Agreement, Amendments, and Waivers:** This Agreement constitutes and contains the entire agreement between the Parties, and supersedes any and all prior negotiations, conversations, correspondence, understandings, term sheets and letters respecting the subject matter hereof. This Agreement may be amended or modified or one or more provisions hereof waived only by a written instrument signed by all of the Parties. No delay or omission by any Party in exercising any right or power arising from any default by the other Party shall be construed as a waiver of such default, nor shall any single or partial exercise thereof preclude any further exercise thereof or the exercise of any other right or power arising from any default by a Party. No waiver of any breach of any covenant or other condition shall be construed to be a waiver of or consent to any previous or subsequent breach of the same or of any other covenant or condition.

**9.4**   **Severability and Captions:** If any term, clause or provision of this Agreement shall be determined by a court of competent jurisdiction to be invalid or unenforceable, the validity and enforceability of any other term, clause or provision shall not be thereby affected, and such invalid or unenforceable term, clause or provision shall be modified by a court in a manner that would make it valid and enforceable and would accomplish the intention of the Parties to the fullest extent lawfully possible. The captions to this Agreement are for convenience only and are to be of no force or effect in construing and interpreting the provisions of this Agreement.

**9.5**   **Construction of Ambiguity:** Each of the Parties participated in the drafting of this Agreement and any ambiguity found herein shall not be construed against any Party. The language of this Agreement shall be construed as a whole, according to its fair meaning and intent, and not strictly for or against any Party, regardless of who drafted or was principally responsible for drafting the Agreement or any specific term or provision hereof.

**9.6**   **Authorized Parties:** Each Party represents and warrants that it has the full power and authority to enter into this Agreement and to perform all actions and obligations set forth herein or required hereunder. Each signatory to this Agreement who signs on behalf of a Party represents and warrants that he or she has the authority to sign on behalf of that Party.

**9.7**   **Ownership of Released Claims:** Each Party hereby warrants and represents that it owns one hundred percent (100%) of all of the claims and counterclaims it is releasing

herein and that no other person has any right or interest in or to any such claims; that it has the power and authority to release such claims and counterclaims; and that it has not transferred, encumbered, pledged or otherwise disposed of any such claims and counterclaims (or any portion thereof).

**9.8    Governing Law/Forum Selection:** The validity, interpretation and legal effect of this Agreement shall be governed by the laws of the State of Florida, applicable to contracts entered into and performed entirely within that State, with respect to the determination of any claim, dispute or disagreement which may arise out of the interpretation, performance, breach or alleged breach of this Agreement, without regard to that State's conflict of laws principles. Any legal proceedings to interpret, construe or enforce any of the terms and provisions of this Agreement, or for redress for any breach or alleged breach of its provisions, or otherwise arising under this Agreement, shall be brought, maintained and resolved solely and exclusively in an appropriate state or federal court located in the Southern District of Florida, and the Parties agree to be subject to, and not to challenge, the venue or the personal jurisdiction of such courts over them in any such proceedings.

**9.10    Counterparts:** This Agreement may be executed in counterparts, and such counterparts may be exchanged via electronic transmission. Each such counterpart shall be deemed an original, and all of which taken together shall be deemed a single document.

**9.11    Opportunity to Consult with Counsel:** By executing this Agreement, each of the Parties acknowledges that it had the opportunity to consult with counsel of its choice concerning the negotiation and terms of this Agreement.

**9.12    Attorneys' Fees:** Each Party shall bear its own costs and attorneys' fees incurred in connection with, by reason of, or with respect to the Litigation and the IPRs brought by AMC/LifeSync and the negotiation and drafting of this Agreement. The provisions of this Section shall not apply to the enforcement of this Agreement by any Party.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement on the dates set forth below.

*KPR U.S., L.L.C.*

By: _____

Print Name: Steve Mason

Title: CEO, Medical Segment

Date: 10/02/2023

*Cardinal Health 200, LLC*

By: _____

Print Name: Steve Mason

Title: CEO, Medical Segment

Date: 10/02/2023

*LifeSync Corporation*

By: _____

Print Name: ROBERT G. BUEHLER

Title: CEO

Date: 10/3/2023

*Advantage Medical Electronics, LLC*

By: _____

Print Name: ROBERT G. BUEHLER

Title: CEO

Date: 10/3/2023

*3M Company*

By: _____

Print Name: _____

Title: _____

Date: _____

**IN WITNESS WHEREOF**, the Parties have executed this Agreement on the dates set forth below.

*KPR U.S., L.L.C.*

By: _____

Print Name: Steve Mason

Title: CEO, Medical Segment

Date: 10/02/2023

*Cardinal Health 200, LLC*

By: _____

Print Name: Steve Mason

Title: CEO, Medical Segment

Date: 10/02/2023

*LifeSync Corporation*

By: _____

Print Name: _____

Title: _____

Date: _____

*Advantage Medical Electronics, LLC*

By: _____

Print Name: _____

Title: _____

Date: _____

*3M Company*

By: _____

Print Name: Veronica Acuria

Title: MSD, President

Date: 10/05/2023

**EXHIBIT A – "Kendall DL Patents"**

| Patent Number | Title | Inventors | Issue Date |
|---|---|---|---|
| US 8,038,484 | ECG electrode connector | Selvitelli, *et al.* | Oct. 18, 2011 |
| US 8,152,571 | ECG electrode connector | Selvitelli, *et al.* | Apr. 10, 2012 |
| US 8,690,611 | ECG electrode connector | Selvitelli, *et al.* | Apr. 8, 2014 |
| US 8,795,004 | ECG electrode connector | Selvitelli, *et al.* | Aug. 5, 2014 |
| US 9,107,594 | ECG electrode connector | Selvitelli, *et al.* | Aug. 18, 2015 |
| US D737,979 | ECG electrode connector | Selvitelli, *et al.* | Sept. 1, 2015 |
| AT 2856938 | ECG electrode connector | Selvitelli, *et al.* | Sep. 12, 2018 |
| BE 2856938 | ECG electrode connector | Selvitelli, *et al.* | Sep. 12, 2018 |
| CA 2646037 | ECG electrode connector | Selvitelli, *et al.* | Nov. 28, 2017 |
| CH 2856938 | ECG electrode connector | Selvitelli, *et al.* | Sep. 12, 2018 |
| CN ZL201310064924.3 | ECG electrode connector | Selvitelli, *et al.* | Sep 9, 2015 |
| CN ZL200810191090.1 | ECG electrode connector | Selvitelli, *et al.* | Apr. 3, 2013 |
| DE 2856938 | ECG electrode connector | Selvitelli, *et al.* | Sep. 12, 2018 |
| DE 2545849 | ECG electrode connector | Selvitelli, *et al.* | Mar. 9, 2018 |
| DE 2070474 | ECG electrode connector | Selvitelli, *et al.* | Feb. 8, 2017 |
| DK 2856938 | ECG electrode connector | Selvitelli, *et al.* | Sep. 12, 2018 |
| EP 2856938 | ECG electrode connector | Selvitelli, *et al.* | Sep. 12, 2018 |
| ES 2856938 | ECG electrode connector | Selvitelli, *et al.* | Sep. 12, 2018 |
| FI 2856938 | ECG electrode connector | Selvitelli, *et al.* | Sep. 12, 2018 |
| FR 2856938 | ECG electrode connector | Selvitelli, *et al.* | Sep. 12, 2018 |
| FR 2070474 | ECG electrode connector | Selvitelli, *et al.* | Feb. 8, 2017 |
| GB 2856938 | ECG electrode connector | Selvitelli, *et al.* | Sep. 12, 2018 |
| GB2545849 | ECG electrode connector | Selvitelli, *et al.* | Mar. 9, 2016 |
| GB 2070474 | ECG electrode connector | Selvitelli, *et al.* | Feb. 8, 2017 |
| IE 2856938 | ECG electrode connector | Selvitelli, *et al.* | Sep. 12, 2018 |
| IT 502019000010587 | ECG electrode connector | Selvitelli, *et al.* | Sep. 12, 2018 |
| MX 318807 | ECG electrode connector | Selvitelli, *et al.* | Mar. 27, 2014 |
| MX 322401 | ECG electrode connector | Selvitelli, *et al.* | Jul. 30, 2014 |
| MX 322402 | ECG electrode connector | Selvitelli, *et al.* | Jul. 30, 2014 |
| MX 342480 | ECG electrode connector | Selvitelli, *et al.* | Sep. 30, 2016 |
| MX 302483 | ECG electrode connector | Selvitelli, *et al.* | Aug. 17, 2012 |
| NL 2856938 | ECG electrode connector | Selvitelli, *et al.* | Sep. 12, 2018 |
| PT 2856938 | ECG electrode connector | Selvitelli, *et al.* | Sep. 12, 2018 |
| SE 2856938 | ECG electrode connector | Selvitelli, *et al.* | Sep. 12, 2018 |
| US 8408948 | ECG electrode connector | Selvitelli, *et al.* | Apr. 2, 2013 |

**EXHIBIT B – "New Clips"**

ECG/EKG lead wires or lead sets having ECG/EKG press stud (i.e., patient side) connectors as shown in the photographs below (without regard to colors or labels), including the lead wires or lead sets bearing product numbers LWM-341DS50/5A, LW-329DS50/3A, LWM-329DS30/5A, LWM-381DS50/6A, LW-381DS50/6A, LWM-341DS50/5V, LWM-341DS50/3A, LW-329DS50/5AT, LWM-329DS50/5AT, LWM-381DS50/3A, LWM-329DS50/5A, LWM-341DS30/5A, LW-341DS30/5A, LWM-329DS120/5AT.**





**Note: The following products numbers appear to be used for both the New Clips in this Exhibit B and the Original Clips in Exhibit C: LW-329DS50/5A, LW-341DS50/5A, and LW-341DS50/3A. The Original Clips bearing product numbers LW-329DS50/5A, LW-341DS50/5A, and LW-341DS50/3A are not New Clips. No Clip with an ECG/EKG press stud (i.e., patient side) connector that is colorably different from the ECG/EKG press stud (i.e., patient side) connector shown in the pictures in Exhibit B is a New Clip or a New Product regardless of the product number.

## EXHIBIT C – "Original Clips"

ECG/EKG lead wires or lead sets having ECG/EKG press stud (i.e., patient side) connectors as shown in the photographs below (without regard to colors or labels), including the lead wires or lead sets bearing product numbers LW-309DS50/5A, LW-309DS50/5AT, LW-309DS50/3A, LW-309DS50/4V, LW-309DS50/5V, LW-309DS50/6A, LW-309DS50/6AT, LW-341DS50/6A, LW-381DS50/3A, LW-381DS50/6A, LW-391DS50/3A, LW-391DS50/5A, LW-3090029/5A, LW-3090S29/3A, LW-3090S29/5A, LW-3090S29/5V, LW-3090S51/3A, LW-3090S51/5A, LW-3090S51/5V, LW-3090SMX/5A, LW-3140S29/3A, LW-3140S29/6A, LW-3180SMX/5DR, LW-3180SMX/6DR, LW-3190S51/5A, LW-3300029/3A2, LW-3300051/3A, LW-3300051/5I, LW-3400029BR, LW-3400051RD, LW-3400051VA, LW-3400051VB, LW-3400051WH, LW-3400V29/5A, LW-3410029/5A, LW-3410051/5A, LW-3500024/3A, LW-3500024/5A, LW-3600029/3I, LW-3700024/3A, LWM-3090S51/5A, LWM-3410051/5A, LW-341DS50/5V, LWM-314DS50/5A, 700-0006-32, 700-0006-33, LW-3700024/3F, LW-341DS120/5A, LWM-3090S51/5A, 700-0006-35, LWM-3140S29/5A, LWM-3410029/5A, LW-3300029/312, 700-0006-37, LWM-3500024/5A, LWM-3500024/3A, LWM-3400V29/5A, 700-0006-38, LW-3700024/3I, LW-3810029/3A, LW-3300029/5A, LW-3700024GR, LWM-3090S51/3A, LW-3400029GR, LW-3400029/5A, LW-33000MX/5A, LW-3090S29/5AT, LWM-3090S29/5AT, LW-3400051GR, LWG-3090029/5A, LWM-3090024/5A, LWM-3090024/3H, LW-3300051BK, LW-3400029VB, LW-3910S29/5A, LW-3300029/3A, LW-3400051BK, LW-3400051/5A, LWM-3090S29/3A, LWM-3090S29/5A, LWM-3090S51/5AT, LWM-3090SMX/5A, LW-3700024BR, LWG-3090SMX/5A, LWM-329DS50/5AT, LW-329DS50/3A, LW-314DS50/5A, LW-329DS50/5AT, LWM-341DS50/3A, LW-381DS50/3A.**



**Note: The following products numbers appear to be used for both the Original Clips in this Exhibit C and the New Clips in Exhibit B: LW-329DS50/5A, LW-341DS50/5A, and LW-341DS50/3A. The Original Clips bearing product numbers LW-329DS50/5A, LW-341DS50/5A, and LW-341DS50/3A are not New Clips. No Clip with an ECG/EKG press stud (i.e., patient side) connector that is colorably different from the ECG/EKG press stud (i.e., patient side) connector shown in the pictures in Exhibit B is a New Clip or a New Product regardless of the product number.